968 A.2d 1151

FRED BURNETT, PLAINTIFF–APPELLANT, v. COUNTY
OF BERGEN AND BERGEN COUNTY CLERK'S
OFFICE, DEFENDANTS–RESPONDENTS.

Argued November 17, 2008—Decided April 27, 2009.

410

412

*Stuart M. Lederman,* argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Lederman, Brenda C. Liss* and *Scott L. Carlson,* on the briefs).

*John M. Carbone,* argued the cause for respondents (*Carbone and Faasse,* attorneys).

*Michael J. Fasano,* argued the cause for amicus curiae New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz,* attorneys).

*Christopher A. Mohr,* a member of the District of Columbia bar, argued the cause for amici curiae Consumer Data Industry Association, LexisNexis, The National Association of Professional Background Screeners and The Real Estate Information Professionals Association (*Graham Curtin,* attorneys; *Thomas R. Curtin, George C. Jones* and *Kathleen N. Fennelly,* on the brief).

*Lewis A. Scheindlin,* Assistant Attorney General, argued cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel).

*Edward L. Barocas,* Legal Director, American Civil Liberties Union of New Jersey argued the cause for *amici curiae* American Civil Liberties Union of New Jersey and Privacy Rights Clearinghouse (*Mr. Barocas* and *Grayson Barber,* attorneys).

Chief Justice RABNER delivered the opinion of the Court.

The Open Public Records Act (OPRA) requires that government records "shall be readily accessible" to the citizens of this State, subject to certain exceptions. *N.J.S.A.* 47:1A–1. Underlying that directive is the bedrock principle that our government works best when its activities are well-known to the public it serves. With broad public access to information about how state and local governments operate, citizens and the media can play a watchful role in curbing wasteful government spending and guarding against corruption and misconduct.

OPRA simultaneously requires public agencies "to safeguard from public access a citizen's personal information" when disclosure would violate a person's "reasonable expectation of privacy." *Ibid.* That concern is squarely implicated here by a single request for eight million pages of land title records of all types, extending over a period of twenty-two years, which contain names, addresses, social security numbers, and signatures of countless citizens of this State. The request was made on behalf of a commercial business planning to catalogue and sell the information by way of an easy-to-search computerized database. Were that to occur, an untold number of citizens would face an increased risk of identity theft.

OPRA's twin aims—of ready access to government records and protection of a citizen's personal information—require a careful balancing of the interests at stake. Here, that balance is heavily influenced by concerns about the bulk sale and disclosure of a large amount of social security numbers—which plaintiff admittedly does not need, and which are not an essential part of the records sought. In addition, the requested records are not related to OPRA's core concern of transparency in government.

Under the unusual circumstances of this case, the balance tips in favor of the citizens' reasonable expectation of privacy in one respect: the records can be disclosed after redaction of individual social security numbers. We therefore agree with the trial court's order to that effect, along with its conclusion that the cost of redaction should be borne by the requestor. Because the Appellate Division upheld redaction on different grounds, we affirm and modify its judgment in part. We also vacate the portion of the judgment that upholds watermarking the documents but do not address the issue further because it is moot.

## I.

Data Trace Information Services (Data Trace) is a technology company that creates computer-based search tools for the title insurance industry. In simple terms, Data Trace compiles, organizes, and sells electronic access to title information it gathers. The company operates land record databases for more than 200 counties in 25 states. It enables title insurance companies to connect regional title databases and to access them using computer software. Plaintiff Fred Burnett is employed by Data Trace and is acting on its behalf.

Defendants are the County of Bergen and the Bergen County Clerk's Office in their capacity as custodians of government records.

On April 17, 2006, plaintiff filed a formal request with the Bergen County Clerk for microfilm copies of rolls of microfilm containing the following records: assignments of mortgages, deeds, discharges/satisfactions of mortgages, lis pendens, miscellaneous, mortgages, releases of mortgages, vacations, construction liens, federal liens, inheritance tax waivers, institutional liens (a request plaintiff later withdrew), and releases of judgment. Plaintiff sought those records for the period spanning January 1984 to the most current at the time. In total, plaintiff asked for about eight million pages of documents, stored on an estimated 2,559 rolls of microfilm, from 1984 to 2006. The realty records con-

tained various personal identifiers including names, addresses, social security numbers (SSNs), signatures, and information on marital status. In support of the request, plaintiff relied on OPRA, *N.J.S.A.* 47:1A–1 to –13, and the common law right of access.

The Bergen County Clerk's Office maintains hard copies of the above records, available for inspection by the public during normal business hours, and microfilm copies of the same records for archival and security purposes.

The parties exchanged correspondence in response to the request but did not resolve when the documents would be ready or at what cost. Among other things, defendants advised that a disclaimer or watermark would appear on the copies so that they would not be mistaken for current, official records.

On August 30, 2006, plaintiff filed a verified complaint and order to show cause seeking a declaratory judgment and injunction requiring defendants to inform him promptly of the copying fee and the date the records would be available. In their answer, defendants asserted they did "not have the capability, staffing or budgetary financing to comply" in light of the size of the request and the requirement that SSNs be redacted before the documents could be released. Because no technology exists to redact information directly from microfilm, defendants explained that the microfilm would have to be converted to paper or an electronic format and then examined visually or scanned electronically so that SSNs could be masked or blocked. According to a bid defendants obtained from a private vendor, the cost of copying, examining, and redacting the records was more than $460,000.[1]

---

[1] Elsewhere in the record, another bid estimates that 6,449 rolls of microfilm, containing more than 19 million frames, need to be copied at a cost of approximately $1.3 million. The record does not explain the discrepancy. Obviously, more than twice the number of realty documents enhances both the privacy concerns at issue and the cost of redaction and copying. In this opinion, we use the number eight million pages, consistent with defendant's certification on this point.

On October 25, 2006, the parties appeared before the Honorable Sybil R. Moses, then Assignment Judge of the Superior Court. The focus of the argument was whether plaintiffs could receive unredacted copies of the records they requested. Judge Moses acknowledged that OPRA favored granting citizens a broad right of access to government documents. She also noted that the Legislature intended to provide against disclosure in "those instances in which a person had a reasonable expectation of privacy." (quoting *Asbury Park Press v. Ocean County Prosecutor's Office*, 374 *N.J.Super.* 312, 331, 864 *A.2d* 446 (Law Div.2004)). Thus, the trial judge framed the discussion by addressing whether SSNs are exempt from redaction under OPRA, per *N.J.S.A.* 47:1A–5(a), or whether citizens have a reasonable expectation of privacy in their SSNs on a publicly recorded document. The trial court noted the proliferation of federal and state laws concerning identity theft and privacy, including *N.J.S.A.* 47:1–16, which she found revealed the Legislature's "deep concern for the confidentiality" of SSNs. Judge Moses concluded that

> considering the most recent legislative action, considering the law in sister states, protect[ing] Social Security numbers, considering all of the legislation, which is either pending or has been enacted ... there was and is not only an expectation of privacy ... but ... the public interest is implicated in this... [A]ccordingly, I conclude that it is against the public interest to enable theft identity to be encouraged and take place.

The trial court also analyzed plaintiff's claim under the common law right of access and concluded that plaintiff's commercial interest in getting unaltered documents was outweighed by the government's interest in protecting the confidentiality of its citizens' SSNs. Plaintiff did not pursue that claim on appeal.

The trial court issued an order on December 4, 2006 directing defendants to (1) inform plaintiff of the copying fee for the records; (2) redact any SSNs from the records sought; and (3) insert a watermark stating the date of copying on each document.

Plaintiff appealed. In a published opinion, the Appellate Division affirmed the trial court's order on different grounds. *Burnett*

*v. County of Bergen,* 402 *N.J.Super.* 319, 322, 343, 954 *A.*2d 483 (App.Div.2008).

The panel canvassed relevant New Jersey statutes and concluded that SSNs on realty records are exempt from the redaction requirements of OPRA, *id.* at 327, 954 *A.*2d 483 (citing *N.J.S.A.* 47:1A–5(a)), and that other statutes that recognize the danger of disclosing SSNs likewise did not require redaction, *id.* at 328–29, 954 *A.*2d 483 (citing *N.J.S.A.* 47:1–16 (prohibiting prospective recording of documents with SSNs, unless SSNs required by law to be filed); *N.J.S.A.* 56:11–45, :8–164 (prohibiting display of SSNs under Identity Theft Prevention Act unless document covered by OPRA)). Nevertheless, the panel found that "there are competing interests that must be balanced before we can determine whether SSNs included in the records should remain unredacted in documents plaintiff seeks to gather, compile and sell to other users." *Id.* at 327–28, 954 *A.*2d 483.

The panel went on to examine the privacy protections guaranteed by article I, section 1 of the New Jersey Constitution. *Id.* at 332–35, 954 *A.*2d 483. The panel found that "[w]hen diverse pieces of information, such as a name, SSN, address, bank or mortgage holder and simulated signature, are assembled into a package—as they are in the records sought by plaintiff to be compiled in a database and sold for commercial purposes—a privacy interest is implicated." *Id.* at 339, 954 *A.*2d 483 (citing *Doe v. Poritz,* 142 *N.J.* 1, 87, 662 *A.*2d 367 (1995)).

After employing the balancing test set forth in *Doe,* the panel concluded that the important privacy interests at stake required redaction of the SSNs. *Id.* at 343, 954 *A.*2d 483. The panel noted the real threat of harm from identity theft and other fraud if SSNs were released in large number. *Id.* at 340–41, 954 *A.*2d 483. It also found that SSNs were not essential to provide notice of property ownership when names, addresses and lot and block numbers plainly identified the properties. *Id.* at 341, 954 *A.*2d 483. In addition, the panel observed that the information sought was for commercial purposes. *Id.* at 343, 954 *A.*2d 483. On

balance, the Appellate Division concluded that the right of privacy under the New Jersey Constitution "establishes protection for New Jersey citizens from wholesale disclosure of SSNs through OPRA requests for masses of recorded realty documents." *Ibid.*

With regard to the trial court's order requiring watermarking on each document, the panel concluded that plaintiff consented to the ruling at oral argument and therefore could not challenge it on appeal. *Id.* at 343–45, 954 *A.*2d 483.

We granted plaintiff's petition for certification. 196 *N.J.* 593, 960 *A.*2d 389 (2008).

## II.

Plaintiff argues that the decision of the Appellate Division should be reversed and the documents he seeks should be released without redaction. He contends that the Appellate Division erred in creating a constitutional right to privacy in SSNs found in recorded realty documents; that the panel misapplied *Doe's* balancing test and mistakenly found a reasonable expectation of privacy in the records; that OPRA expressly prohibits defendants from redacting SSNs from recorded realty documents; that the parties did not reach an agreement on watermarking; and that OPRA does not permit such markings.

Defendants agree with the decision of the Appellate Division and maintain they acted properly in not disclosing records before redacting them. They argue that citizens have a constitutional privacy interest that protects against disclosure of their SSNs; that individuals have a reasonable expectation of privacy in their SSNs; that New Jersey law requires redaction of SSNs from documents before they may be released; and that plaintiff consented to watermarking and thus cannot challenge the trial court's order on that issue.

We granted amicus curiae status to the following organizations: the New Jersey Land Title Association (NJLTA); the Consumer Data Industry Association, LexisNexis, the National Association of

Professional Background Screeners, and the Real Estate Information Professionals Association (collectively CDIA); the American Civil Liberties Union of New Jersey and the Privacy Rights Clearinghouse (collectively ACLU); and the Attorney General.

NJLTA and CDIA filed briefs on behalf of plaintiff and agree with his statutory arguments about OPRA. NJLTA adds that the use of computer technology to examine land title records will reduce the time and expense involved in title searches. CDIA also challenges the Appellate Division's finding of a constitutional right to privacy in this case.

The Attorney General argues that this case can be decided on statutory grounds; that the Court should therefore decline to reach the question of a constitutional right to privacy; that OPRA requires a balancing of interests when disclosure would violate a citizen's reasonable expectation of privacy; that redaction of SSNs in this matter is required under that balancing test; and that OPRA does not prohibit watermarking.

The ACLU maintains that disclosure of SSNs in this case would violate a citizen's reasonable expectation of privacy under both the State Constitution and OPRA.

### III.

We start by analyzing the statute. Because we find that OPRA's language provides for a balancing of the interests in privacy and disclosure, and for redaction of SSNs under the circumstances of this case, we do not reach the constitutional question the Appellate Division addressed and therefore do not endorse its conclusion. *See Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 109, 609 *A*.2d 11 (1992) (Pollock, J., concurring) ("[C]onstitutional questions should not be reached and resolved unless absolutely imperative in the disposition of the litigation." (quoting *State v. Saunders*, 75 *N.J.* 200, 229, 381 *A*.2d 333 (1977) (Clifford, J., dissenting))); *Bell v. Stafford Twp.*, 110 *N.J.* 384, 389, 541 *A*.2d 692 (1988) (same).

## A.

■ To determine whether the documents plaintiff requests should be disclosed, we look to the Legislature's intent expressed through OPRA. Legislative intent "is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005).

■ At the outset of New Jersey's statutory code, the Legislature reminds us that a statute's "words and phrases shall be read and construed within their context" and "given their generally accepted meaning." *N.J.S.A.* 1:1–1. To that end, "statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." *Bedford v. Riello,* 195 *N.J.* 210, 224, 948 *A.*2d 1272 (2008) (citing *In re Distribution of Liquid Assets,* 168 *N.J.* 1, 17–18, 773 *A.*2d 6 (2001)); *see also* 2A *Sutherland on Statutory Construction* § 46:05 (6th ed. 2002).

■■ When the language in a statute "is clear and unambiguous, and susceptible to only one interpretation," courts should not look "to extrinsic interpretative aids." *Lozano v. Frank DeLuca Constr.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004) (citation and internal quotations marks omitted). However, "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039 (quoting *Cherry Hill Manor Assocs. v. Faugno,* 182 *N.J.* 64, 75, 861 *A.*2d 123 (2004)). Courts "may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result." *Id.* at 493, 874 *A.*2d 1039.

## B.

OPRA provides for ready access to government records by the citizens of this State. *See Mason v. City of Hoboken,* 196 *N.J.* 51,

64–65, 951 *A*.2d 1017 (2008). The statute directs that "all government records shall be subject to public access unless exempt," and that "any limitations on the right of access ... shall be construed in favor of the public's right of access." *N.J.S.A.* 47:1A–1. Consistent with those aims, the statute broadly defines "government records" to include documents made, maintained or kept in the course of official government business, but exempts twenty-one categories of information from the definition. *N.J.S.A.* 47:1A–1.1.

OPRA's plain language has two competing sections of particular relevance to this case:

(1) section 1's command that public agencies have "an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy," *N.J.S.A.* 47:1A–1 ("privacy clause" or "privacy provision"); and

(2) section 5's directive that "[p]rior to allowing access to any government record, the custodian thereof shall redact from that record any information which discloses the social security number, credit card number, unlisted telephone number, or driver license number of any person; °... except that a social security number contained in a record required by law to be made, maintained or kept on file by a public agency shall be disclosed when access to the document or disclosure of that information is not otherwise prohibited by" law, *N.J.S.A.* 47:1A–5(a); *see also N.J.S.A.* 47:1A–1.1.

In other words, OPRA allows for disclosure of SSNs that happen to appear on documents that must otherwise be filed, and at the same time the statute cautions against allowing access to records that would violate a citizen's reasonable privacy interest. Those contrary aims may sometimes collide, as plaintiff's request demonstrates.

■ Both parts of the statute are substantive, section 1, though it appears at the beginning, no less than section 5. Section 1 is neither a preface nor a preamble. It has no telltale "whereas"

clauses that often appear in a preamble. It appears after OPRA's enactment clause, making the provision part of the body of the law. *PRB Enterprises, Inc. v. S. Brunswick Planning Bd.*, 105 *N.J.* 1, 5, 518 *A.2d* 1099 (1987); 1A *Sutherland, supra,* § 20:03; 2A *id.* § 47:04. Plus the very language expressed in the privacy clause reveals its substantive nature: it does not offer reasons why OPRA was adopted, as preambles typically do; instead, it focuses on the law's implementation. Specifically, it imposes an obligation on public agencies to protect against disclosure of personal information which would run contrary to reasonable privacy interests.

Other courts have focused on the substantive nature of OPRA's privacy clause. In *Serrano v. South Brunswick Township*, 358 *N.J.Super.* 352, 362, 817 *A.2d* 1004 (App.Div.2003), the Appellate Division allowed public access to a tape of a 911 call made by a homicide defendant a few hours before the crime. The defendant did not object. In its ruling, the Court noted

it is reasonable to anticipate that [OPRA's] declaration of the "public policy" respecting the "citizen's reasonable expectation of privacy" will be considered extensively by the [Government Records Council] and the courts. The provision does not confront us here, however, because no privacy claim has been asserted.

. . . .

In the absence of a privacy claim with respect to the subject 911 tape, we leave for other occasions interpretation of the "citizen's reasonable expectation of privacy" declared in *N.J.S.A.* 47:1A-1. Plainly, the issues presented on such occasions could be complex and challenging, and we recognize that they might entail a consideration and balancing of the [relevant] interests . . . and [of] the extent and nature of the interplay, if any, between the "citizen's reasonable expectation of privacy" and the mandate, also set forth in *N.J.S.A.* 47:1A-1, to "construe[ ] in favor of the public's right of access" any limitations in the statute on that right.

[*Id.* at 368–69, 817 *A.2d* 1004 (final alteration in original).]

Relying in part on *Serrano*, the Law Division denied access to a "chilling, wrenching" 911 tape of a victim, after finding that OPRA's privacy clause justified not disclosing the government record under the facts of the case. *Asbury Park Press, supra,* 374 *N.J.Super.* at 330–31, 864 *A.2d* 446. Among other things, the trial court found support for protection of the victim's privacy in

OPRA's legislative history as well as the "words chosen in Section 1 of OPRA." *Ibid.*

The Government Records Council (GRC), an informal mediation program designed to resolve disputes under OPRA, has also relied on the privacy provision in addressing requests for access to government records. *See, e.g., Catrell v. N.J. Dep't of Corr.,* GRC Complaint No. 2006–121 (Feb. 28, 2007) (citing OPRA's privacy provision in denying disclosure of visitor's list that contained names, relationships, addresses and partial SSNs of inmate's visitors); *Bernstein v. Boro of Park Ridge Custodian of Records,* GRC Complaint No. 2005–99 (July 14, 2005) (citing OPRA's privacy provision in denying disclosure of names and addresses of dog license owners to entrepreneur seeking to start electric fence business).

Consistent with *Serrano* and *Asbury Park Press,* other courts have acknowledged the substantive import of OPRA's privacy provision. *See Courier News v. Hunterdon County Prosecutor's Office,* 358 *N.J.Super.* 373, 380 n. 5, 817 *A.*2d 1017 (App.Div.2003) (recognizing possibility of claim under privacy provision in reviewing request for 911 tape, but noting that no argument was advanced based on caller's reasonable expectation of privacy); *see also John Does v. City of Trenton Dep't of Pub. Works,* 565 *F.Supp.*2d 560, 567, 570–71 (D.N.J.2008) (noting OPRA's privacy provision is a "command[ ]" to public agencies and observing GRC's use of a balancing analysis to enforce that provision).

Plaintiff concedes that OPRA could be read to require a balancing of interests in limited situations, but not when there is specific statutory language that addresses an issue. In such cases, he argues, the Legislature has already done the balancing. He points to section 5's requirement that SSNs be redacted before access is allowed, unless they are contained in a record the public agency must maintain on file.

Ordinarily, specific language in a statute takes precedence over more general language. *Wilson v. Unsatisfied Claim*

*& Judgment Fund Bd.*, 109 *N.J.* 271, 278, 536 *A*.2d 752 (1988). Under that common approach to statutory construction, section 5's precise language about SSNs would prevail over section 1's more broadly worded privacy warning. However, because a literal reading of section 5 could lead to absurd results, we cannot stop at its plain language. *See M.S. v. Millburn Police Dep't*, 197 *N.J.* 236, 250, 962 *A*.2d 515 (2008); *DiProspero, supra*, 183 *N.J.* at 493, 874 *A*.2d 1039; *Turner v. First Union Nat'l Bank*, 162 *N.J.* 75, 84, 740 *A*.2d 1081 (1999).

For example, nothing in the language of section 5 would prevent a felon with multiple, prior convictions for identity theft, who has no legitimate reason for access, from requesting and obtaining records containing millions of SSNs linked to particular names and addresses. Indeed, looking only at section 5, plaintiff's request for eight million pages of documents that contain personal identifiers, extending over a period of twenty-two years, would have to be granted even to an inmate serving time for identity theft.[2] That cannot be; and we doubt the Legislature so intended.

We likewise doubt the Legislature envisioned plaintiff's actual request when it adopted OPRA. We recognize that "[i]t is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design." *New Capitol Bar & Grill Corp. v. Div. of Employment Sec.*, 25 *N.J.* 155, 160, 135 *A*.2d 465 (1957).

The better approach is to harmonize the language in sections 1 and 5 and balance the interests each section advances: ready access to government documents while safeguarding the

---

[2] *N.J.S.A.* 47:1A–2.2 prevents "a person who is convicted of any indictable offense ... [from] seeking government records containing personal information pertaining to the person's victim or the victim's family," including their SSNs. In that instance, the right of access shall be denied. That limited protection would not likely cover a broad-based, general inquiry like the one this case presents.

citizen's reasonable expectation of privacy. *See Bedford, supra,* 195 *N.J.* at 224, 948 *A.*2d 1272; 2A *Sutherland, supra,* §§ 46:05, 47:06.

### C.

OPRA's legislative history also supports a balancing of the interests expressed in sections 1 and 5 of the statute. The Senate conducted hearings on public access to government records on March 9, 2000. *See Issues Dealing with Public Access to Government Records: Hearing on S. 161, S. 351, S. 573, and S. 866 Before the S. Judiciary Comm.,* 209th Leg. (N.J. 2000) [*Hearing*]. At the time, a number of related bills were under consideration. Among them was Senator Robert Martin's draft legislation, S. 866, 209th Leg. (N.J. 2000), which was the primary focus of the hearing. The basic structure of the bill called for records to be made public except for certain exemptions. There was no language in the draft about protecting privacy rights.

Throughout the hearing, Senator Norman Robertson repeatedly voiced questions about the disclosure of personal information. In his words, "my only concern ... is that we could create a situation where we have inadvertently created an unqualified right to many, many documents that will impact on the legitimate privacy interest of citizens in the state." *Hearing, supra,* at 10. He stressed that "there are going to be a whole host of things that we couldn't possibly anticipate," like access to addresses of battered women's shelters and E–ZPass records, where the public's right to know should be balanced against legitimate privacy interests of individuals. *Id.* at 10–11. Senator Robertson pressed both to maintain the common law right of access, which requires such a balancing of interests, and to include statutory protections of the right to privacy in any new law. *Id.* at 9–11, 31–34, 76–80. Robertson emphasized that "whenever we sit down to try to craft a piece of legislation, there are always competing interests. . . . In this case, there is somewhat of a competition between the right of access and the right of privacy. . . ." *Id.* at 76.

After the hearing, Senator Martin introduced Senate Bill 2003, which incorporated the very protection his colleague advanced. *See* S. 2003, 209th Leg. (N.J. 2000). A new section was added, providing that "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." *Ibid.* That language remained part of the proposed legislation and is the privacy provision now codified at *N.J.S.A.* 47:1A–1. The principle appears alongside OPRA's competing command that all documents shall be readily accessible to the public, unless specifically exempted. *Ibid.*

OPRA's legislative history, therefore, offers direct support for a balancing test that weighs both the public's strong interest in disclosure with the need to safeguard from public access personal information that would violate a reasonable expectation of privacy.

### D.

■ To balance OPRA's interests in privacy and access, we look to *Doe* for guidance. Although *Doe* considered constitutional privacy interests implicated by Megan's Law, it relied on case law concerning statutory privacy provisions under the Freedom of Information Act (FOIA). *Doe, supra,* 142 *N.J.* at 82–86, 662 *A.*2d 367. Similarly, the Government Records Council applies the factors outlined in *Doe* in addressing statutory privacy claims under OPRA. *See Merino v. Boro of Ho–Ho–Kus,* GRC Complaint No. 2003–110 (July 8, 2004). Because *Doe* clearly identifies the key inquiries, we adopt its factors here:

(1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.

[*Doe, supra,* 142 *N.J.* at 88, 662 *A.*2d 367 (citation and internal quotation marks omitted).]

## IV.

We now apply the above principles. The realty records plaintiff seeks are government records under OPRA. By statute, the records must be maintained on file by the county recording officer in well-bound books or by some other authorized method. *N.J.S.A.* 46:19–1. Bergen County keeps the records both in hard copy and microfilm format. The records, then, would be accessible through either medium. *N.J.S.A.* 47:1A–5(d).

Our concern is with the SSNs contained in those records. But for the SSNs, the documents are plainly subject to disclosure.

█ Section 5's obligation to redact SSNs does not apply here because the SSNs in question are contained in realty records "required by law to be made, maintained or kept on file by a public agency." *N.J.S.A.* 47:1A–5(a). Although we later look to other New Jersey statutes that reveal how strongly public policy disfavors the disclosure of SSNs, those laws do not "otherwise prohibit[ ]" disclosure of the records sought here. *Ibid.* Looking only at section 5, then, the records are subject to disclosure.

Defendant and amici argue that disclosure of millions of records containing SSNs and other personal identifiers "would violate the citizen's reasonable expectation of privacy." *N.J.S.A.* 47:1A–1. We agree. OPRA's privacy provision is directly implicated here because the requested documents contain SSNs along with the names, addresses, signatures, and marital status of a substantial number of New Jersey residents. We therefore turn to the balancing test outlined in *Doe* to harmonize OPRA's competing concerns and evaluate whether disclosure without redacting SSNs is proper in this case.

### A.

We consider *Doe's* first two factors together: the type of records sought and the information they contain. Plaintiff asks for copies of assignments of mortgages, deeds, discharges/satisfactions of mortgages, lis pendens, mortgages, releases of mortgages,

vacations, construction liens, federal liens, inheritance tax waivers, and releases of judgment for the period from 1984 through 2006. Those realty documents contain details about ownership of various properties along with personal information about the owners.

To be sure, a number of points favor disclosure of the records without first redacting them. They are public records, required to be accepted for recording, maintained and kept. *See generally N.J.S.A.* 46:18, :19, 47:1, :2, :3. The very purpose of recording and filing them "is to place the world on notice of their contents." *Dugan v. Camden County Clerk's Office,* 376 *N.J.Super.* 271, 279, 870 *A.*2d 624 (App.Div.2005). Potential buyers and creditors rely on the records to establish and protect their ownership interests. *See N.J.S.A.* 46:22–1. In addition, individual realty records are available, and will remain available, for copying and inspection at clerks' offices. According to plaintiff, eleven counties have placed realty records on the Internet. During oral argument, plaintiff advised that he believed eight of those counties had unredacted records online. (One county later removed all records dated prior to October 1, 2005, when *N.J.S.A.* 47:1–16—which prospectively requires the removal of SSNs from documents before filing—went into effect.) Those unchallenged practices, though, cannot justify a violation of a reasonable privacy interest.

It bears mention that the realty records in question do not require SSNs. While some individuals may have voluntarily added that information, it is more likely that they signed off on documents prepared by lenders or others. In fact, one married couple wrote to the Bergen County Clerk in 2005 and asked to remove their SSNs from the public record. They were surprised to find that the information was on a mortgage filed in 1996. They also explained they understood that SSNs were not needed on the document. Even if they had initially realized that the document contained SSNs, and that the record would be available for inspection at the record vault in Bergen County, it is unlikely they or others anticipated their personal information might end up

in a computerized, commercial database a decade or more afterward.

■ The fact that a SSN may be available at a clerk's office does not eliminate a person's expectation of privacy altogether. As the Court noted in *Doe*,

"home addresses often are publicly available through sources such as telephone directories and voter registration lists, but '[in] an organized society, there are few facts that are not at one time or another divulged to another.' The privacy interest protected by Exemption 6 [in FOIA] 'encompass[es] the individual's control of information concerning his or her person.' An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." [142 *N.J.* at 83, 662 *A.*2d 367 (alterations in original) (quoting *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 *U.S.* 487, 501, 114 *S.Ct.* 1006, 1015, 127 *L.Ed.*2d 325, 337 (1994) (citation omitted)).]

Accordingly, the *Doe* Court found that although information under Megan's Law "may be available to the public, in some form or other, [that] does not mean that plaintiff has no interest in limiting its dissemination." 142 *N.J.* at 84, 662 *A.*2d 367; *see also State v. Reid*, 194 *N.J.* 386, 389, 945 *A.*2d 26 (2008) (recognizing reasonable expectation of privacy in subscriber information under State Constitution, notwithstanding disclosure to Internet service providers); *State v. McAllister*, 184 *N.J.* 17, 25, 31–33, 875 *A.*2d 866 (2005) (recognizing reasonable expectation of privacy in bank records under State Constitution, notwithstanding disclosure to banks).

That SSNs are combined with other personal information elevates the privacy concern at stake. In *Doe*, the Court noted that the issue was "not whether plaintiff has a privacy interest in his address, but whether the inclusion of plaintiff's address, along with other information, implicates any privacy interest." 142 *N.J.* at 83, 662 *A.*2d 367. As noted earlier, SSNs in realty records appear along with names, addresses, information on marital status, signatures, and details about one's mortgage.

■ In addition, bulk disclosure of realty records to a company planning to include them in a searchable, electronic database

would eliminate the practical obscurity that now envelops those records at the Bergen County Clerk's Office. As the Supreme Court has observed, "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 *U.S.* 749, 764, 109 *S.Ct.* 1468, 1477, 103 *L.Ed.*2d 774, 790 (1989). For that reason, the "compilation of otherwise hard-to-obtain information alters the privacy interest implicated by disclosure of that information." *Ibid.*

In *Doe* and *Reporters Committee*, the state and federal governments, respectively, assembled pieces of information. That did not happen here; private attorneys or individuals prepared the realty records. But the cases are instructive for another reason: they highlight the fact that composite documents—in this case records that would be made available in a searchable computer database—implicate privacy concerns much more broadly than documents with one item alone.

In short, "interests in privacy may fade when the information is a matter of public record, but they are not non-existent." *Doe, supra*, 142 *N.J.* at 87, 662 *A.*2d 367 (citing *Reporters Comm., supra*, 489 *U.S.* at 763 n. 15, 109 *S.Ct.* at 1476 n. 15, 103 *L.Ed.*2d at 789 n. 15). The same is true for SSNs in realty records on file in a clerk's office.

### B.

The next two factors in *Doe* address the potential for harm from disclosure. Of particular concern is the significant risk of identify theft from disclosure of vast numbers of SSNs.

SSNs are unique identifiers. They are closely tied to a person's financial affairs and their disclosure presents a great risk of harm. [A]rmed with one's SSN, an unscrupulous individual could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's pay-

check.... Succinctly stated, the harm that can be inflicted from the disclosure of a SSN to an unscrupulous individual is alarming and potentially financially ruinous.

[*Greidinger v. Davis,* 988 *F.*2d 1344, 1354–55 (4th Cir.1993) (citations and footnote omitted).]

As the Federal Trade Commission (FTC) has warned, people who obtain SSNs can impersonate victims and use their SSNs "to facilitate the opening of new accounts, gain access to existing accounts, commit medical identity theft, seek employment, and obtain government benefits." FTC, *Security in Numbers: SSNs & ID Theft* 3 (2008), *available at* http://www.ftc.gov/os/2008/12/-P 075414ssnreport.pdf.

The New Jersey Legislature noted the link between disclosure of SSNs and identity theft when it passed the Identity Theft Prevention Act in 2005. A core purpose of that law was "to ensure that the Social Security numbers of the citizens of the State of New Jersey are less accessible in order to detect and prevent identity theft." *N.J.S.A.* 56:11–45(h); *see also* U.S. Gov't Accountability Office, Publ'n No. 07–752, *Social Security Numbers: Federal Actions Could Further Decrease Availability in Public Records, Though Other Vulnerabilities Remain* 14 (2007), *available at* www.gao.gov/new.items/d07752.pdf ("SSNs are ... a key piece of information used to create false identities for financial misuse or [to] assume another individual's identity.").

Even more alarming are statistical findings by the FTC. Nearly ten million Americans—almost five percent of the adult population in the United States—had been victimized by identity theft during a twelve-month period from 2002 to 2003. FTC, *Identity Theft Survey Report* 13 (2003), *available at* www.ftc.gov/os/2003/09/ synovatereport.pdf. Of those, 3.25 million had their personal information misused to open new accounts, obtain new loans, or commit theft, fraud or other crimes. *Ibid.* According to a different survey, about 8.3 million adults discovered they were victimized by identity theft in 2005. FTC, *2006 Identity Theft Survey Report* 4 (2007), *available at* www.ftc.gov/os/2007/11/SynovateFinalReport ID-Theft2006.pdf.

Amicus CDIA questions how many of those complaints relate to misappropriated SSNs as opposed to stolen credit cards or other items. Such a debate misses the point: identity theft today is real, and it is directly linked to the misuse of exposed or stolen SSNs. Plaintiff's plan to place documents containing SSNs in a centralized, easy-to-search computer database presents just such a risk.

As noted before, plaintiff seeks eight million pages of realty documents spanning twenty-two years. In an effort to downplay the risk of harm, amicus NJLTA suggests that only a fraction of those pages might contain SSNs. They cite to Florida's experience in 2004, when it redacted 30 million pages of recorded documents dating back to 1970 and found that only 2.6 percent required redaction. Using Florida's outcome as a guide, 208,000 of the eight million pages sought would contain SSNs and other personal identifiers—a substantial number by any account. NJLTA contends that a lower percentage would apply to New Jersey records, but even if the actual yield is smaller, the risk of harm remains great.

To compound the problem, there is simply no practical way to give advance notice to an untold number of citizens whose personal identifiers would be disclosed under the pending OPRA request. Some of them filed documents a quarter century ago. None have reason to expect that their SSNs might now be sold for inclusion in a searchable, computerized database. As a result, those individuals would not know to request that their SSNs be deleted before they are disseminated more widely.[3] *See Michelson v.*

---

[3] Certain statutes, as the dissent points out, allow for notice to be published in newspapers. *See post* at 447–48, 968 *A.2d* at 1173. Those laws, however, address situations where people are, or should be, aware of the unfolding action, or have strong reason to watch out for written public notice. For example, before any public notice is given for the sale of real estate by a sheriff, *see N.J.S.A.* 2A:61–1, the prior owner would have received direct notice of the underlying action long in advance. Similarly, potential bidders on public contracts have a strong incentive to be on the lookout for public notices and advertisements of upcoming bids. *See N.J.S.A.* 40A:11–23.

*Wyatt,* 379 *N.J.Super.* 611, 622, 880 *A.*2d 458 (App.Div.2005) (noting need for care in evaluating whether access to information under OPRA "is inimical to ... the individual interests of the persons about whom information is sought, particularly when those ... individuals have not received notice of the request and are unable to express their privacy concerns").

## C.

The fifth factor is the adequacy of safeguards to prevent unauthorized disclosure. Simply put, there would be no meaningful control over dissemination of the SSNs after the release of the records.

Plaintiff, a technology company that operates land record databases for more than 200 counties in 25 states, would be free to use the realty records as it sees fit. It has represented that it intends to develop a computerized clearinghouse of records for paying customers.

Disclosure of the unredacted records thus raises a number of risks. Nothing would prevent plaintiff's paying customers from using the database for inappropriate purposes. Also, nothing would prevent plaintiff from reselling its searchable database or placing it on the Internet if its marketing approach were to change.

## D.

The sixth factor assesses the need for access. Plaintiff concedes that it has no need for the information the trial court ordered redacted. While homebuyers, lenders and creditors must—and do—have access to records of ownership, plaintiff admits that it has "no interest in any social security numbers that may be contained in the requested real property records." Rather, plaintiff wants the underlying documents, which do not require SSNs, to add to its commercial database.

As a general rule, we do not consider the purpose behind OPRA requests. *See Michelson, supra,* 379 *N.J.Super.* at 620, 880 *A.*2d 458. An entity seeking records for commercial reasons has the same right to them as anyone else. However, when legitimate privacy concerns exist that require a balancing of interests and consideration of the need for access, it is appropriate to ask whether unredacted disclosure will further the core purposes of OPRA: " 'to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.' " *Mason, supra,* 196 *N.J.* at 64, 951 *A.*2d 1017 (quoting *Asbury Park Press, supra,* 374 *N.J.Super.* at 329, 864 *A.*2d 446); *see also Nat'l Archives & Records Admin. v. Favish,* 541 *U.S.* 157, 172, 124 *S.Ct.* 1570, 1580, 158 *L.Ed.*2d 319, 335 (noting that under FOIA, to give effect to exemption protecting personal privacy of citizens, "the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable").

Neither of OPRA's goals is furthered by disclosing SSNs that belong to private citizens to commercial compilers of computer databases. Were a similar request made by an investigative reporter or public interest group examining land recording practices of local government, this factor would weigh differently in the balancing test.

### E.

The final factor focuses on "whether there is an express statutory mandate, articulated public policy, or other recognized public interest" in favor of public access. *Doe, supra,* 142 *N.J.* at 88, 662 *A.*2d 367.

The Legislature has expressed increasingly strong concerns against disclosure of SSNs in recent years. In 2005, after OPRA's passage, the Legislature adopted *N.J.S.A.* 47:1–16 and made it effective October 1, 2005. That law expressly prohibits any person, and any public or private entity, from "print[ing] or display[ing] in any manner an individual's Social Security number

on any document intended for public recording with any county recording authority." *N.J.S.A.* 47:1–16(a). Whenever a document presented for filing contains a SSN, "the recording authority shall delete, strike, obliterate or otherwise expunge that number prior to recording the document." *N.J.S.A.* 47:1–16(b).

As a result, documents presented for filing on or after October 1, 2005 will no longer contain extraneous SSNs, and requests for those records will not present the privacy issues raised by plaintiff's application. *N.J.S.A.* 47:1–16, though, is prospective only. Had the statute directed that counties redact public records retroactively, without providing a funding source, the law might have raised questions about the rule against unfunded local mandates. *See N.J. Const.* art. VIII, § 2, ¶ 5(a); *N.J.S.A.* 52:13H–2.

Shortly afterward, the Legislature again emphasized its concern against public disclosure of SSNs when it adopted the Identity Theft Prevention Act (ITPA), *P.L.* 2005, *c.* 226. The law went into effect on January 1, 2006. The ITPA specifically recognized the need to limit access to SSNs "whenever possible" to avoid giving access to information "an individual may want kept private." *N.J.S.A.* 56:11–45(g). As noted earlier, the Legislature also proclaimed as a valid public purpose the need "to ensure that the Social Security numbers of the citizens of the State of New Jersey are less accessible in order to detect and prevent identity theft." *N.J.S.A.* 56:11–45(h). To that end, the ITPA prohibits any person, or public or private entity, from publicly posting or displaying SSNs, *N.J.S.A.* 56:8–164(a)(1), or intentionally communicating or otherwise making SSNs available to the public, *N.J.S.A.* 56:8–164(a)(4). The law exempts from coverage any records made available under OPRA, *N.J.S.A.* 56:8–164(e), and therefore does not directly resolve the pending case.

Federal law also underscores the importance of safeguarding SSNs. *See, e.g.,* 42 *U.S.C.A.* § 405(c)(2)(C)(viii)(I) (stating that SSNs "that are obtained or maintained by authorized persons pursuant to any provision of law … shall be confidential, and no authorized person shall disclose any such" SSNs); 5 *U.S.C.A.*

§ 552(b)(6) (precluding public disclosure under FOIA of "personnel and ... similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"); *Sherman v. U.S. Dep't of the Army*, 244 *F.*3d 357, 359, 365–66 (5th Cir.2001) (interpreting FOIA to preclude disclosure of SSNs).

Data aggregators like plaintiff submit that the public interest is well-served by releasing realty records. Through the use of technology, they can make title searches more efficient and less expensive, and thereby provide a benefit to the public. Rather than requiring title searchers to look through book after book of county records onsite, searches can be done at a computer terminal with the click of a mouse. Alongside that promise lays the problem this case highlights: easy access to unredacted records at a central, computerized location can also provide easy access to the SSNs on those records, which can lead to serious consequences.

### F.

On balancing the above factors, we find that the twin aims of public access and protection of personal information weigh in favor of redacting SSNs from the requested records before releasing them. In that way, disclosure would not violate the reasonable expectation of privacy citizens have in their personal information.

This holding is limited to the unique facts before us: a bulk request for millions of realty records, spanning decades, which contain a substantial number of SSNs the requestor does not need, whose dissemination via a centralized computer database would pose an increased risk of identity theft to countless individuals, with no possibility of advance notice to those individuals, where the request does not further OPRA's core aim of transparency in government. This balancing of interests must be applied case by case, and under different facts, another result might be proper.

■ OPRA provides that costs may be passed on to request-ors. The statute allows for recovery of actual duplication costs. *N.J.S.A.* 47:1A–5(b). In addition, requestors may be assessed costs for preparation work involved in responding to a request. *See N.J.S.A.* 47:1A–5(c) (allowing reasonable special service charge when records cannot be reproduced using ordinary equip-ment or reproduction involves extraordinary expenditure of time and effort); *N.J.S.A.* 47:1A–5(d) (allowing reasonable special charge if "a substantial amount of manipulation" is required).

To redact SSNs from rolls of microfilm, as plaintiff requests, Bergen County would need to pay a private vendor to convert the films to paper or an electronic format, and then examine them visually or scan them electronically so that SSNs can be masked and blocked. That process cannot be accomplished with ordinary equipment, entails extra time and effort, and calls for the manipu-lation of the microfilm records—costs that are contemplated by sections 5(c) and (d).

The County forwarded plaintiff a bid for the anticipated actual cost of redaction and duplication of eight million pages of records. We recognize the cost may prove prohibitively expensive. But while the original estimate of $460,000 is high, it is still less than the statutorily mandated maximum of $0.25 per page. *N.J.S.A.* 47:1A–5(b). Accordingly, we agree with the trial court's ruling that the cost of redaction and duplication is to be borne by plaintiff.

## V.

At the hearing on the order to show cause, on October 25, 2006, Judge Moses skillfully guided the parties toward settlement on a number of issues. One area she attempted to resolve amicably was whether the microfilmed records could be "watermarked" so that it would be apparent the records were copies provided by the Clerk's office on a certain date and not originals. (By "water-marking" documents, information is embedded into them which cannot be altered or removed.) That approach was intended to

avoid confusion over records that might be updated after the date of copying—for example, when a mortgage is discharged or a lien filed.

At the hearing, both sides agreed to include a disclaimer that would be watermarked on the documents, "assuming the cost is minimal." When the parties could not come to terms afterward, Judge Moses ordered them to insert a copying date diagonally on each document in a way that would not obscure the contents of the document.

Plaintiff appealed and argued that OPRA provided no authority for watermarking public records. Defendant argued successfully to the Appellate Division that the parties were bound by their agreement. The Appellate Division thus upheld the trial court's order without addressing the merits of the issue.

We do not agree. We do not find that both sides entered a mutual, binding agreement on the issue of watermarking. Their agreement was qualified; it was conditioned on the assumption that the cost of watermarking would be minimal. At the time, defendant thought the fee "would [not] be anything substantial." As it turned out, watermarking will add $20,000 to the cost. We cannot find that $20,000 was within the "minimal" amount the parties contemplated or agreed to. *See Kupper v. Barger*, 33 *N.J.Super.* 491, 494, 111 *A.*2d 73 (App.Div.1955) (finding that enforcement of a stipulation entered into by attorneys in open court "is denied where there appears to have been an absence of mutuality of accord between the parties or their attorneys in some substantial particulars, or the stipulated agreement is incomplete in some of its material and essential terms").

No court has yet reviewed plaintiff's substantive arguments about whether OPRA authorized watermarking of public records. We decline to do so for the first time now, in part because the issue is moot. Indeed, in her efforts to resolve the case, Judge Moses specifically asked plaintiff if he would "go ahead" if he were required to pay more than $400,000 for redac-

tion. "Do you really want it?" she asked. "No," responded plaintiff. He added that he was not relying on the estimated cost because "we don't think it's necessary to redact Social Security numbers." Before this Court, plaintiff argues that the expense of redaction "effectively renders the requested documents unavailable to the public." If plaintiff changes his mind and decides to pay for redacted records, he can petition the trial court for a ruling on the merits of watermarking. Based on the colloquy before Judge Moses and argument on appeal, the issue is now moot.

## VI.

For the reasons set forth above, we affirm and modify the judgment of the Appellate Division relating to disclosure of the requested records, and reverse on the question of watermarking because the issue is moot.

Justice ALBIN, dissenting.

The majority opinion directly contravenes a clear and unambiguous statute mandating public accessibility to government records, *N.J.S.A.* 47:1A–5(a), and, in doing so, strikes a blow against governmental transparency in the electronic age. Today, the documents denied are realty records; tomorrow, with this case as precedent, other documents touching on important public policy issues will be kept sealed in the judicially-sanctioned realm of "practical obscurity"—the dusty shelves of some storage room. Because public access to microfilm realty records maintained in the Bergen County Clerk's Office is dictated by statute, I cannot join the majority in fashioning a judicially-acceptable alternative result. I therefore respectfully dissent.

## I.

The opening provision of the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13, provides that "government records shall be readily accessible for inspection, copying, or examination by the

citizens of this State ... and any limitations on the right of access ... shall be construed in favor of the public's right of access." *N.J.S.A.* 47:1A–1. Under OPRA, "[a] custodian shall permit access to a government record and provide a copy thereof in the medium requested if the public agency maintains the record in that medium." *N.J.S.A.* 47:1A–5(d). A " '[g]overnment record' " includes "microfilm" that a governmental agency has "made, maintained or kept on file in the course of ... its official business." *N.J.S.A.* 47:1A–1.1. The realty records at the heart of this case—such as, deeds, releases, mortgages, and assignments and discharges of mortgages—are government records subject to OPRA. *See ibid.* Those records are kept in each county in either "large, well-bound books of good paper or by some other method as authorized pursuant to R.S. 47:1–5." *N.J.S.A.* 46:19–1. One "other method" for maintaining those records is microfilm. *Ibid.*; *N.J.S.A.* 47:1–5. The realty records at issue are preserved on microfilm.

Generally, "[p]rior to allowing access to any government record, the custodian thereof shall redact from that record any information which discloses [a] social security number." *N.J.S.A.* 47:1A–5(a). However, "a social security number contained in a record required by law to be made, maintained or kept on file by a public agency shall be disclosed when access to the document or disclosure of that information is not otherwise prohibited...." *Ibid.* No one disputes that realty records are "required by law to be made, maintained or kept on file by a public agency." *Ibid.* The clear language of the statute tells us that realty records are subject to public access—in the medium in which they are maintained, here, microfilm—regardless of the presence of social security numbers in those documents.[1]

---

[1] The Legislature made no provision for the deletion of social security numbers on documents filed with county clerks' offices before October 1, 2005, the date *N.J.S.A.* 47:1–16 became effective. *See L.* 2005, *c.* 99, § 2. *N.J.S.A.* 47:1–16(a) now provides that "[n]o person, including any public or private entity, shall print or display in any manner an individual's Social Security number on any

In OPRA, the Legislature distinguished between government records that are *not* mandated by law to be kept on file—in those cases the county clerk must remove the social security numbers before making them accessible to the public—and those records containing social security numbers that the law mandates be kept on file—in those cases the clerk *must* make the records available to the public without redaction. *See N.J.S.A.* 47:1A–5(a). In the event the clerk decides to redact the social security numbers from the latter category of records, no provision of OPRA authorizes the clerk to pass along the cost to the requestor.

Contrary to our standard canons of statutory construction, the majority takes the expression of legislative intent in the preamble to OPRA to void a plainly- and precisely-worded statute, *N.J.S.A.* 47:1A–5(a). In the opening provision of OPRA, the Legislature made clear its general intent in passing that statute:

> The Legislature finds and declares it to be the public policy of this State that:
>
> . . . .
>
> a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy. . . .
>
> [*N.J.S.A.* 47:1A–1.]

In my view, the Legislature conclusively determined that the need for public access to government records outweighed the privacy interests of individuals when it provided in *N.J.S.A.*

---

document intended for public recording with any county recording authority." Under *N.J.S.A.* 47:1–16, a county clerk is responsible for redacting social security numbers from documents presented for recording. *N.J.S.A.* 47:1–16(b) ("Whenever a document is presented for public recording with any county recording authority and that document displays a person's Social Security number, the recording authority shall delete, strike, obliterate or otherwise expunge that number prior to recording the document.").

Moreover, the Identity Theft Prevention Act, *L.* 2005, *c.* 226 (codified in scattered sections of Titles 2C and 56), which prohibits the disclosure of social security numbers, does not apply to realty records. *See N.J.S.A.* 56:8–164(e) ("Nothing in this section shall apply to documents that are recorded or required to be open to the public pursuant to Title 47 of the Revised Statutes."). Had the Legislature intended to provide for the deletion of social security numbers on realty records before 2005, it certainly could have done so.

47:1A–5(a) that "a social security number contained in a record required by law to be made, maintained or kept on file by a public agency shall be disclosed when access to the document or disclosure of that information is not otherwise prohibited...." A generally-stated legislative finding and declaration ordinarily does not trump a specific and unambiguous statutory mandate. *See Wilson v. Unsatisfied Claim & Judgment Fund Bd.*, 109 *N.J.* 271, 278, 536 *A.*2d 752 (1988) ("In general, when there is a conflict between general and specific provisions of a statute, the specific provisions will control."); Norman J. Singer, 1A *Sutherland Statutory Construction* § 20.3 (6th ed. 2002) ("[S]tatements regarding scope or purpose of the act that appear in the preamble may aid the construction of doubtful clauses, but they cannot control the substantive provisions of the statute. The preamble ... cannot be used to discern the legislature's intent if no doubt exists as to a statute's meaning." (footnote omitted)). The majority reads the preamble's privacy provision to override a clearly-delineated legislative judgment, in particular, the redaction exception enumerated in *N.J.S.A.* 47:1A–5(a).

The Legislature evidently concluded that the need for public access to government records—whether individually or in bulk—serves a number of essential purposes in a democracy, including fostering governmental transparency and public awareness. The Legislature has determined that the right of public access outweighs the risk of harm to individuals whose social security numbers appear in certain government records. Nothing in the statute suggests that if a county clerk chooses to redact social security numbers from realty records kept on microfilm and requested by a person, whether a commercial data aggregator or Pulitzer Prize-winning reporter, that the clerk then is allowed to charge the requestor more than twenty-fold the cost of merely releasing the documents unredacted.

## II.

In this case, Data Trace Information Services, a national title technology company, requested that the Bergen County Clerk's

Office copy microfilm of realty documents covering the years 1984 to 2006.[2]  Data Trace intends to use the information to create an electronic title search database, which presumably will make title searches more accessible and affordable to businesses and the public. The objective of recording realty documents is to notify the public of property ownership and rights.  *See N.J.S.A.* 46:21–1; *see also Dugan v. Camden County Clerk's Office,* 376 *N.J.Super.* 271, 279, 870 *A.*2d 624 (App.Div.) ("Indeed, the purpose of recording or filing the [realty] documents and providing public access to them is to place the world on notice of their contents."), *certif. denied,* 184 *N.J.* 209, 876 *A.*2d 283 (2005).

Currently, to conduct a title search, a person must go to a county clerk's office and review the records one document at a time, the same way land purchasers, title insurers, and lawyers have searched realty records for the past two hundred years. Information technology of the twenty-first century now presents a better way.  It is recognized that "[a]ccess to electronic aggregated public records ... provides important political, social, and economic benefits.  Commercial entities are necessarily involved in the gathering, analysis, and distribution of public record data because of the complexity of the work and the financial resources required."  Brian N. Larson & Genelle I. Belmas, *Second Class for the Second Time: How the Commercial Speech Doctrine Stigmatizes Commercial Use of Aggregated Public Records,* 58 *S.C. L.Rev.* 935, 937 (2007).  Thus, Data Trace—a commercial data aggregator engaged in a profit-making enterprise—would be advancing one of the primary purposes of the State's recording statutes:  placing the public on notice of financial or other interests that a party may have in a piece of property.  Access to an electronic database would substantially save time and expense for potential creditors, purchasers, title searchers, and others whose only other recourse to examine realty records is a cumbersome trip to a county clerk's office.

---

[2] Fred Burnett, the plaintiff in this case, represents the interests of Data Trace, which seeks the documents at issue.

It bears mentioning that OPRA does not distinguish between requestors, giving a superior right of public access to records to one class of persons over another. The majority's balancing test now requires an inquiry into the motives of the requestor, compelling county clerks and even judges to classify requestors into favored and non-favored categories. Who is to say that the bulk release of records to a journalist or academic rather than a commercial vendor will promote a greater public good that outweighs an individual's privacy interests? The majority has turned the clear language of *N.J.S.A.* 47:1A–5(a) into a theory of relativity that might allow only preferred persons and causes access to bulk release of public records.

Obviously, to the majority, Data Trace does not represent a favored cause. To reproduce the microfilm on file requested by Data Trace, the cost would be about $19,000. However, the Bergen County Clerk refused to release the documents unless they were first scrubbed of any social security numbers. The cost of searching for and redacting any social security numbers would be approximately $460,000. That cost-prohibitive amount has the real-world effect of deterring access to the records—cloaking them in "practical obscurity." Data Trace argues that the statute does not authorize a county clerk to compel a requestor to bear such a prohibitive cost. I agree.

### III.

I do not believe that in enacting OPRA the Legislature intended to distinguish between direct, personal access to realty records in a county clerk's office and access through electronic means. Under the majority's approach, Data Trace can visit a clerk's office and copy—with portable photocopiers or scanners—the realty records one document at a time, social security numbers and all, without offending the statute, and then place the information it has acquired on its electronic database. If, at some point in the future, the expected profit exceeds the cost, that is how this commercial data aggregator will proceed. That has been the

experience of the judiciary and is one reason why the Administrative Office of the Courts has not erected artificial barriers for the bulk release of court records that are available in electronic form. However, by supplanting *N.J.S.A.* 47:1A–5(a) and applying its judicially-crafted balancing test, the majority prohibits the realty records from being transferred to Data Trace in a cost-effective way, thus deterring the bulk release of those public records.

Under OPRA, "[i]f the custodian of a government record asserts that part of a particular record is exempt from public access ... the *custodian shall delete or excise* from a copy of the record that portion which the custodian asserts is exempt from access and shall promptly permit access to the remainder of the record." *N.J.S.A.* 47:1A–5(g) (emphasis added). The import of this provision is that the record custodian, not the requestor, shoulders the responsibility for redacting any portion of a record that the custodian believes is protected from public access. Of course, here, we know that *N.J.S.A.* 47:1A–5(a) does not require the redaction of social security numbers from realty records. It is the Bergen County Clerk who, on her own, decided that those numbers should be deleted from any realty records. The majority concedes that the requestor here may view those documents, or even copy them, at the Clerk's Office in their unredacted form. *See ante* at 428–29, 968 *A.*2d at 1162–63. Thus, although the requestor must pay for duplication and reproduction fees, the Clerk should have to bear the cost of redaction on which she insists. Those costs should not be considered a "special service charge." *See N.J.S.A.* 47:1A–5(c) to –5(d).

## IV.

Even under the majority's balancing standard, Data Trace should not have been denied release of the documents on microfilm based on the meager record before the Court. The Bergen County Clerk objected to the bulk release of realty records on the basis that large numbers of social security numbers of unsuspecting individuals would be released to a commercial data aggregator,

but yet the Clerk presented the Court with but *one* example of social security numbers on such a record. And in that one example, apparently, the social security numbers were placed on the document unbeknownst to the concerned individuals. The Clerk, it seems, made no effort to cull the realty records for other documents containing social security numbers. Without having any knowledge of the number of documents with social security numbers in the requested realty records, the Clerk, and now the majority, wildly speculates—in extrapolating from that one example—that a multitude of our citizens will be exposed to identity theft. At the very least, the Clerk had the obligation to conduct a reasonable search, and, on that basis, make a reasonable estimate of the number of documents involved. The Clerk failed to do that.

Last, if we were to take to heart the majority's concern, which is, how might a convicted felon misuse a public record, *ante* at 424–25, 968 *A*.2d at 1160–61, one could find a reason to close down access to all public records, whether kept in the State House or a courthouse.

## V.

I understand the objective that the majority seeks to achieve. From a public policy perspective, the majority's view may not be unreasonable. My quarrel with the majority is that, I believe, the Legislature has set forth its intended policy goals in the clear language of *N.J.S.A.* 47:1A–5(a).

In my opinion, Data Trace is entitled to the documents it has requested solely at the cost of reproducing the microfilm on file in the Bergen County Clerk's Office. The Clerk is at liberty to remove any social security numbers that might appear on the requested realty records, but must bear the cost. One alternative approach for the Clerk is to put the public on advance notice, through the print and electronic media, and allow individuals to go to the Clerk's Office to request deletion of a social security number if such an identifier appears on a document that does not by law require one. That form of notice has long been regarded as an adequate means of communication to parties who have

legally-cognizable interests at stake. *See, e.g., N.J.S.A.* 2A:61–1 (requiring public notice for sales of real estate by government actors); *N.J.S.A.* 40A:11–23 (requiring advertisements for public contract bids). Such an approach would protect the individual's privacy interests and be faithful to the disclosure requirements mandated by *N.J.S.A.* 47:1A–5(a).

Today's majority opinion will significantly close the door to the Open Public Records Act and potentially have far-reaching adverse consequences to the dissemination of information maintained in state governmental offices.

I would reverse the Appellate Division and grant Data Trace's request. For the reasons expressed, I respectfully dissent.

Justice LONG joins in this opinion.

*For affirmance in part as modified/reversal in part*—Chief Justice RABNER and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*Dissenting*—Justices LONG and ALBIN—2.