NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3972-14T4
 A-4214-14T4
 A-2387-15T4
 A-3066-15T4

L.R., individually and on
behalf of J.R., a minor,
 APPROVED FOR PUBLICATION
 Plaintiffs-Appellants,
 October 16, 2017
v.
 APPELLATE DIVISION
CAMDEN CITY PUBLIC SCHOOL
DISTRICT and JOHN C. OBERG in
his official capacity as Interim
School Business Administrator
and Board Secretary,

 Defendants-Respondents.
_______________________________

L.R., individually and on
behalf of J.R., a minor,

 Plaintiffs-Respondents/
 Cross-Appellants,

v.

PARSIPPANY-TROY HILLS TOWNSHIP
PUBLIC SCHOOL DISTRICT and DAVID F.
CORSO in his official capacity as
Records Custodian of the Parsippany-
Troy Hills Township Public School
District,

 Defendants-Appellants/
 Cross-Respondents.
_________________________________

THE INNISFREE FOUNDATION,
 Plaintiff-Appellant,

v.

HILLSBOROUGH TOWNSHIP BOARD
OF EDUCATION and AIMAN MAHMOUD,
Records Custodian,

 Defendants-Respondents.
________________________________

THE INNISFREE FOUNDATION,

 Plaintiff-Respondent,

v.

CHERRY HILL BOARD OF EDUCATION
and JAMES DEVEREAUX, Records
Custodian,

 Defendants-Appellants.
_____________________________________

 Argued September 18, 2017 – Decided October 16, 2017

 Before Judges Sabatino, Ostrer and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Camden County, Docket No. L-
 2736-14 (A-3972-14).

 On appeal from Superior Court of New Jersey,
 Law Division, Morris County, Docket No. L-
 3104-14 (A-4214-14).

 On appeal from Superior Court of New Jersey,
 Law Division, Somerset County, Docket No. L-
 1372-15 (A-2387-15).

 On appeal from Superior Court of New Jersey,
 Law Division, Camden County, Docket No. L-
 3902-15 (A-3066-15).

 2
 A-3972-14T4
Walter M. Luers argued the cause for L.R.,
individually and on behalf of J.R., a minor,
appellants in A-3972-14 and respondents/
cross-appellants in A-4214-14 (Law Offices of
Walter M. Luers, LLC, attorney; Mr. Luers, of
counsel and on the briefs; Jamie Epstein, on
the briefs).

Joseph D. Castellucci, Jr., argued the cause
for Camden City Public School District and
John C. Oberg, respondents in A-3972-14
(Florio Perrucci Steinhardt & Fader, LLC,
attorneys; Eric M. Wieghaus, on the brief).

Eric L. Harrison argued the cause for
Parsippany-Troy Hills Township Public School
District and David F. Corso, appellants/cross-
respondents in A-4214-14 (Methfessel & Werbel,
PC, attorneys; Mr. Harrison, of counsel and
on the briefs; Kegan S. Andeskie, on the
briefs; Emily H. Kornfeld, on the brief).

John D. Rue argued the cause for The Innisfree
Foundation, appellant in A-2387-15 and
respondent in A-3066-15 (John Rue &
Associates, attorneys; Mr. Rue, of counsel and
on the briefs; Krista Lynn Haley, on the
briefs).

Vittorio S. LaPira argued the cause for
Hillsborough Township Board of Education and
Aiman Mahmoud, respondents in A-2387-15
(Fogarty & Hara, attorneys; Mr. LaPira, of
counsel and on the brief; Robert D. Lorfink,
on the brief).

Raina M. Pitts argued the cause for Cherry
Hill Board of Education and James Devereaux,
appellants in A-3066-15 (Methfessel & Werbel,
PC, attorneys; Ms. Pitts and Vivian Lekkas,
on the briefs).

Cynthia J. Jahn, General Counsel, argued the
cause for amicus curiae New Jersey School
Boards Association in A-3972-14, A-4214-14, A-
2387-15, and A-3066-15.

 3
 A-3972-14T4
 Krista Lynn Haley argued the cause for amicus
 curiae The Innisfree Foundation in A-3972-14
 and A-4214-14 (John Rue & Associates,
 attorneys; Ms. Haley, on the briefs).

 Iris Bromberg argued the cause for amicus
 curiae American Civil Liberties Union of New
 Jersey in A-4214-14 (American Civil Liberties
 Union of New Jersey Foundation, attorneys; Ms.
 Bromberg, Edward L. Barocas, Jeanne LoCicero,
 and Krista Haley, on the brief).

 The opinion of the court was delivered by

SABATINO, P.J.A.D.

 These four related appeals1 concern efforts by plaintiffs (a

nonprofit advocacy organization for disabled students, and the

mother of a disabled student in the Camden City Public Schools)

to obtain from several school districts copies of settlement

agreements and records reflecting the provision of special

services to other qualified students. In each of these cases,

plaintiffs, with the assistance of counsel, requested copies of

the documents. The respective school districts resisted

disclosure, citing statutory and regulatory provisions that

generally safeguard the privacy of students in their records,

subject to certain specified exceptions and conditions.

 Plaintiffs' requests raise several novel issues of access

under the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to -

1
 The appeals, which have overlapping counsel, were argued on the
same date, and we consolidate them for purposes of this opinion.

 4
 A-3972-14T4
13, the New Jersey Pupil Records Act ("NJPRA"), N.J.S.A. 18A:36-

19, and the Federal Family Educational Rights and Privacy Act of

1974 ("FERPA"), 20 U.S.C.A. § 1232g. The requests also implicate

administrative regulations adopted under both the NJPRA and FERPA.

 Specifically, the four cases before us arise out of requests

made to school district officials in Cherry Hill (A-3066-15),

Hillsborough (A-2387-15), Parsippany-Troy Hills (A-4214-14), and

Camden City (A-3972-14). The lawsuits generated conflicting

results in the trial courts.

 The judge in the Hillsborough case concluded that the

plaintiff advocacy organization's request must be disallowed under

the regulations of the New Jersey Department of Education, N.J.A.C.

6A:32-7.1 to -7.8. That ruling was consistent with a prior

administrative decision of the Government Records Council ("GRC")

interpreting those regulations.

 Conversely, the judges in the Cherry Hill and Parsippany-Troy

Hills cases ruled that the applicable laws and regulations allow

the plaintiff-requestors access to the records, provided that the

disabled students' personally identifiable information was

redacted from them. Those two judges disagreed with the GRC's

legal interpretation of the state regulations in that prior case.

As a caveat, the judge in the Parsippany-Troy Hills case upheld a

special service charge of $96,815 calculated by the School Board

 5
 A-3972-14T4
to perform the review and redaction process before the records

were turned over.

 Finally, in the fourth case, Camden City, the trial judge

dealt with the separate issues posed by a parent's access to her

own child's records, "access logs" for those records, and other

documents possessed by the school district that refer to her child.

The judge ordered the school district to produce an unredacted

copy of the child's own records and access logs, but not other

records.

 For the reasons that follow, we hold that the respective

plaintiffs in the Hillsborough, Parsippany-Troy Hills, and Cherry

Hill cases are entitled to appropriately-redacted copies of the

requested records, provided that on remand those plaintiffs

either: (1) establish they have the status of "[b]ona fide

researcher[s]" within the intended scope of N.J.A.C. 6A:32-

7.5(e)(16); or (2) obtain from the Law Division a court order

authorizing such access pursuant to N.J.A.C. 6A:32-7.5(e)(15).

 In either event, the school districts shall not turn over the

redacted records until they first provide reasonable advance

notice to each affected student's parents or guardians. The

parents and guardians must be afforded the opportunity to object

and provide insight to the school district officials about what

 6
 A-3972-14T4
may comprise or reveal personally identifying information in their

own child's records before the redactions are finalized.

 We also remand the Camden City case for further proceedings

with respect to documents naming plaintiff's child that also could

refer to other students, but affirm the trial court's grant of

access concerning records that exclusively mention plaintiff's

child.

 I.

 All four of the appeals before us involve the Innisfree

Foundation ("Innisfree"), either as a plaintiff or as amicus

curiae. As described in its briefs, Innisfree is a non-profit

organization that "assists families of children with disabilities

who reside in New Jersey to advocate for their children's

educational needs." Innisfree asserts that its interest in access

to the school records it is requesting "arises out of its concern

for the special education programs of the children of its

constituents who are (or seek to be) classified as in need of

special education services under the Individuals with Disabilities

Education Act ("IDEA")," 20 U.S.C.A. §§ 1400 to -1482. Innisfree

has been certified by the New Jersey Supreme Court as a "pro bono

entity" under Rule 1:21-11(b).

 7
 A-3972-14T4
 Innisfree's Records Requests and Lawsuits

 In August 2015, Innisfree submitted substantially identical

requests under OPRA to both the Cherry Hill and Hillsborough school

districts. Those requests sought:

 All settlement agreements executed in the past
 two years and related to disputes between [the
 district] and parents of students related to
 the provision of special education services,
 where the counterparties were parents (or a
 single parent) of a child or children for whom
 special education services were or are either
 provided or sought. (Personally identifiable
 information may be redacted).

 According to Innisfree, it has presented similar OPRA

requests to many other school districts in this State. Its counsel

represented to us at oral argument that it plans eventually to

submit similar records requests to every New Jersey public school

district.

 Anticipating that the school districts might want to redact

the requested records for student privacy reasons, Innisfree added

the following proviso to its requests:

 (1) To the extent that any such records
 contain personally identifiable information
 related to any individual student, please
 redact that personally identifiable
 information prior to disclosure.

 (2) To the extent that you assert that any
 requested records are exempted from disclosure
 under OPRA, and also unavailable under the

 8
 A-3972-14T4
 common law right of access, please provide a
 complete Vaugh[n] index[.]2

 Both the Cherry Hill and Hillsborough school districts denied

Innisfree's records requests. In Cherry Hill's denial, it cited

a GRC decision, Popkin v. Englewood Board of Education, Complaint

No. 2011-263 (Gov't Records Council Dec. 18, 2012) (slip op. at

8). The GRC in Popkin had exempted a special education settlement

agreement from OPRA disclosure in its entirety, upon finding that

the requestor was not authorized to obtain it under the NJPRA.

Cherry Hill also declined to produce a Vaughn index, asserting

that such indices are "something prepared by order of a court on

matters which are questionably protected."

 Hillsborough, meanwhile, asserted that the requested

documents were FERPA "education records" protected from

disclosure, 20 U.S.C.A. § 1232g, and "student records" under

N.J.A.C. 6A:32-2.1, a regulation promulgated in connection with

the NJPRA.

 In October 2015, Innisfree filed separate complaints in the

Law Division in Camden County against the Cherry Hill district and

2
 A "Vaughn index" is a submission "in which the custodian of
records identifies responsive documents and the exemptions it
claims warrant non-disclosure." North Jersey Media Grp., Inc. v.
Bergen Cty. Prosecutor's Office, 447 N.J. Super. 182, 199 (App.
Div. 2016). See Vaughn v. Rosen, 484 F.2d 820, 826-27 (D.C. Cir.
1973), cert. denied, 415 U.S. 977, 94 S. Ct. 1564, 39 L. Ed. 2d
873 (1974).

 9
 A-3972-14T4
its custodian of records, and in Somerset County against the

Hillsborough district and its own custodian of records. The

complaints each invoked a requestor's statutory rights to

government records under OPRA, as well as under the common law.

Cherry Hill and Hillsborough opposed the complaints, arguing that

their conduct in withholding the documents was justified under the

applicable laws and regulations governing student records.

 The Trial Court's Ruling as to Cherry Hill

 On February 9, 2016, the trial court in Camden County ordered

the Cherry Hill district to produce the agreements "with the

appropriate redactions" and to prepare and serve a Vaughn index.

The judge rejected the district's reliance on Popkin, concluding

that such GRC opinions lack precedential value and are non-binding

on the court. The judge also ruled that Innisfree was a prevailing

party under OPRA, granted its request for attorney's fees, and

declined to entertain its common-law right to access claim. On

March 16, 2016, the court entered final judgment in favor of

Innisfree and stayed the judgment pending appeal.

 The Trial Court's Ruling as to Hillsborough

 An opposite result was reached in the Hillsborough

litigation. On January 8, 2016, the trial court in Somerset County

dismissed Innisfree's complaint with prejudice. The judge

concluded that the NJPRA exempted the settlement agreements from

 10
 A-3972-14T4
OPRA disclosure in their entirety, even if those documents were

redacted, because they were "student records" as defined in the

NJPRA's regulations. The judge further noted in her oral opinion

that Innisfree was not authorized to gain access to student records

under the regulations contained in N.J.A.C. 6A:32-7.5. The judge

did not address FERPA, or Innisfree's common-law right of access

claim.

 Innisfree has appealed the trial court's ruling in the

Hillsborough case, and the school district has appealed the trial

court's ruling in the Cherry Hill case.

 L.R.'s Requests for Records and Her Two Cases

 L.R.3 is the parent of a minor child, J.R., who attends public

school in the Camden City school district. In May 2014, an

attorney named Jamie Epstein submitted an OPRA request to the

Camden City district, seeking the "FERPA access log" for J.R.'s

school records. A FERPA access log is a document maintained by a

school district, which lists who has been given access to a

particular student's school records. Through Epstein, L.R. also

sought letters and emails sent to or received by Jonathan Ogbonna,

a district staff member, since March 2, 2012, containing J.R.'s

3
 At oral argument on the appeal, all counsel agreed that they had
no objection to the use of the initials of L.R. and her child J.R.
in this opinion, given the use of initials for them in the trial
court below.

 11
 A-3972-14T4
name "in the subject or body of the record." The request also

sought certain other records.

 In May 2014, the Camden district's interim administrator,

John C. Oberg, produced the access log for J.R., but redacted the

document "to protect confidential information of the student and

[J.R.'s] parents."4 Epstein replied that the district's response

was "improper because no redactions should be made, since, as

indicated, the request is made on behalf of my client [J.R.]."

 The Camden school district's general counsel wrote to Epstein

and addressed the access log redaction issue. He maintained that

the district's actions were proper under state law, asserting that

Epstein had "not presented the requisite written consent under

N.J.A.C. 6A:32-7.5(e)(13), authorizing the [d]istrict to produce

J.R.'s student record information" to him. In response, Epstein

"[w]ithout waiving any rights concerning [the district's] improper

denial," emailed the district's counsel a self-drafted

authorization form signed by L.R., which read:

 I, [L.R.], as parent and legal guardian of
 [J.R.], I hereby extend my 20 USCS § 1232g.
 Family Educational and Privacy Act rights to
 my attorney, Jamie Epstein.

 Oberg denied Epstein's request for the Ogbonna records,

4
 It appears that L.R. and J.R.'s names and home address were
redacted from the documents.

 12
 A-3972-14T4
citing various concerns about student confidentiality,

administrative burdens, and disruption. Oberg also noted that

Epstein had not provided written consent in a sufficient form to

divulge J.R.'s records.

 Epstein then made a second request, seeking:

 1. Letters, memos, correspondence and emails
 sent to or received by Clara West, Case
 Manager, since 7/1/12 to present which
 contain[s] the term [J.R.] aka JR. in the
 subject or body of the record.

 2. All educational/special educational
 records created, received, kept or maintained
 by Clara West, Case Manager, since 7/1/12 to
 present which contains the term [J.R.] aka JR.

The Camden district, through Oberg, denied this request as well,

citing confidentiality and overbreadth concerns.

 During the same time period, in May 2014, Epstein wrote to

Ogbonna directly and asked for "access [to J.R.'s] school records;

including, but not limited to, [J.R.'s] special education, health,

administrative, academic and disciplinary records." Ogbonna

replied that the district was not able to grant such access to

J.R.'s student records "unless and until it receives written

consent from [J.R.'s] parent or legal guardian[.]" Ogbonna

enclosed an "Authorization and Consent to Release Records" form,

to be completed "before any records are produced." The district's

authorization form included the following language:

 13
 A-3972-14T4
 This consent and authorization is being made
 under State and federal law requiring parental
 consent as a prerequisite to obtaining student
 or health records. I hereby release the
 Camden City [s]chool [d]istrict, and its
 employees and agents, from any liability or
 responsibility in connection with producing
 the aforesaid records in connection with this
 request.

The district rejected Epstein's proposed waiver form as "vague"

and noted that it did not contain a liability waiver.

 This dispute initially came to a head in the Office of

Administrative Law, after Epstein filed an administrative

complaint with the New Jersey Department of Education against the

district, alleging violations of federal and state law for

withholding the requested documents. After both sides moved for

summary decision, an Administrative Law Judge ("ALJ") decided that

the district was required to provide J.R.'s own records to Epstein.

Among other things, the ALJ concluded that Epstein's waiver was

sufficient to reflect parental consent.

 The Camden City Litigation

 In July 2014, a different attorney representing L.R. filed

an OPRA complaint in the Law Division in Camden County against the

Camden City school district and Oberg. The complaint sought an

order requiring the district to produce an unredacted access log

for J.R.'s records, the Ogbonna documents, and the West documents,

along with attorneys' fees and costs.

 14
 A-3972-14T4
 On October 20, 2014, the trial judge5 ordered the district to

produce the unredacted access log, but specifically noted that

access to the FERPA access log was not being granted under the

authority of OPRA. The judge denied L.R.'s request for the Ogbonna

and West documents. The judge denied the Camden City district's

ensuing motion for reconsideration.6

 L.R. has appealed the judge's decision, asserting that the

judge erred in ordering production of the unredacted access log

by relying upon FERPA rather than OPRA. She also contends that

the judge should have granted her access to the other documents

relating to J.R. maintained by Ogbonna and West. The Camden City

school district has not cross-appealed.

 The Parsippany-Troy Hills Case

 Meanwhile, L.R. and J.R. pursued a separate records request

and litigation with the Parsippany-Troy Hills school district in

Morris County. In November 2014, Epstein, on behalf of J.R.,

served an OPRA request upon Parsippany-Troy Hills seeking:

 (1) All requests made on behalf of [disabled]
 students for independent educational

5
 This was a different judge in the Camden vicinage than the judge
who presided over the Cherry Hill matter. The judge in the Camden
City case is now retired.
6
 After additional proceedings were held involving other documents
not at issue on appeal, the judge ordered the district to produce
those other documents. The parties entered into a consent order
calling for the district to pay L.R.'s attorney an agreed-upon sum
in reasonable counsel fees and costs.

 15
 A-3972-14T4
 evaluations ["IEE"] and all responses to
 those requests.

 (2) All requests made on behalf of [disabled]
 students for independent evaluations
 ["IE"] and all responses to those
 requests[.]

The request sought such records for the period from July 1, 2012

to November 4, 2014, with "personal identifiers of students and

their parents or guardians" redacted, "leaving only initials[.]"

 Parsippany-Troy Hills's records custodian denied the request

as overbroad. The custodian noted in part that the request would

require the district to perform "a wholesale search of records"

pertaining to its current students, along with those who no longer

attend, and that "OPRA does not contemplate such [research]." The

custodian also asserted that the requested records were pupil

records exempt from OPRA disclosure.

 In December 2014, L.R., through the same attorney who had

represented her in the Camden City litigation, filed a complaint

in the Law Division in Morris County, alleging that the Parsippany-

Troy Hills district had violated OPRA by failing to produce

redacted documents responsive to her request. The complaint sought

an order requiring the district to provide redacted documents,

"leaving only initials[.]" Parsippany-Troy Hills moved for

summary judgment, asserting that the records were confidential

student records exempt from OPRA disclosure under FERPA and the

 16
 A-3972-14T4
NJPRA. In the alternative, the district asserted that the

production of the records would require an overly burdensome search

of student files not contemplated by OPRA.

 During the ensuing motion proceedings before the Morris

County judge, the Parsippany-Troy Hills Director of Special

Services submitted a certification detailing the substantial

administrative efforts that would be required to respond to L.R.'s

request and to make appropriate redactions. The Director certified

that approximately 1,200 district students were "classified as

eligible for special education services" out of 6,934 total

students enrolled. Additionally, 180 students "either graduated

or aged out," and 65 once-classified students were "declassified"

between September 1, 2012, and November [5], 2014. Thus, according

to the Director, 1,445 student files could contain documents

responsive to plaintiff's request.

 The Director further explained that the documents sought were

"not housed in any central repository[,]" nor stored or compiled

electronically, but that hard copies were kept in student files,

either at the central office or in "school-level files" at each

school "maintained by the students' respective case managers."7

He estimated that it would take the district's "licensed special

7
 As of March 2015, the district employed twenty-seven case
managers.

 17
 A-3972-14T4
education professionals" ("LSEPs") approximately one hour per

student to review the appropriate files, redact, and produce the

requested documents. He noted that LSEPs earn, at a minimum, $67

per hour.

 L.R. objected to the district's special service charge

estimate, and sought discovery (including a deposition of the

director), a plenary hearing, and the opportunity to retain an

expert to address the issue. She disputed the district's claims

that none of the responsive documents were maintained

electronically, that it would take one hour to review, retrieve,

and redact responses from each student file, and that only LSEPs

could perform such a review.

 On April 7, 2015, the Morris County judge, sua sponte,

dismissed L.R. and J.R. from the complaint, substituted Epstein

as plaintiff, and granted the request for the IEE and IE requests

and responses, "subject to redaction of all student personal

identifiers, including initials[.]" Based upon the

certifications, the court ordered Epstein to pay a $96,815 special

service charge to the district, with 50% to be paid in advance of

any document production.8 Epstein declined to pay the special

service charge and the district has not produced the records. The

8
 This total represents 1,445 hours of review (one hour per file)
times the quoted $67 per hour rate for staff time.

 18
 A-3972-14T4
Morris County judge further awarded Epstein attorneys' fees and

costs as the prevailing party.

 Parsippany-Troy Hills appealed the trial court's orders.

Meanwhile, L.R. cross-appealed from portions of the court's

decisions. In particular, L.R. challenges the substitution of

Epstein for her as the real party in interest and the court's

holding that the district was required to redact student initials

before disclosing the documents.

 The Amici

 We have granted the participation as amicus curiae of two

additional organizations: the New Jersey School Boards

Association ("The Association") and the American Civil Liberties

Union of New Jersey ("ACLU-NJ"). The Association supports the

school districts' legal arguments in these appeals, and the ACLU-

NJ, conversely, supports the arguments of plaintiffs. In addition,

as we have already noted, Innisfree has been granted amicus status

in the two appeals involving L.R.

 Other Related Appeals and The Global Appellate Stay

 Innisfree and others have made similar requests for records

to other school districts around the State. As a result of trial

court orders entered in those various cases, more than a dozen

other appeals are pending before this court in various stages of

briefing. Following a global case management conference with a

 19
 A-3972-14T4
retired appellate judge serving on recall, counsel agreed that the

present four appeals were suitable "test cases" the disposition

of which might provide guidance in the other pending matters. In

the meantime, a global order staying the other appeals has been

entered.

 II.

 Since as early as 1944, the laws of our State have governed

the terms for inspection of records relating to children enrolled

in our public schools. See L. 1944, c. 217 (directing the State

Board of Education to "prescribe rules and regulations governing

the public inspection of pupil records and the furnishing of any

other information relating to the pupils and former pupils of any

school district."). The 1944 statute, ultimately codified at

N.J.S.A. 18:2-4.1, did not specifically address the privacy or

other interests at stake. Nor did the 1944 enactment provide the

State Board with explicit guidance in developing the mandated

regulations. Ibid.

 The 1944 provision was amplified in 1967 with the passage of

what is now known as the NJPRA. See L. 1967, c. 271. This

development occurred four years after OPRA's predecessor, the

Right to Know Law, L. 1963, c. 73, took effect.

 20
 A-3972-14T4
 The Right to Know Law, a general statute encompassing the

terms of access to a variety of governmental records, required

that:

 all records which are required by law to be
 made, maintained or kept on file by any board,
 body, agency, department, commission or
 official of the State or . . . by any public
 board, body, commission or authority created
 pursuant to law by the State . . . shall, for
 the purposes of this act, be deemed to be
 public records.

 [N.J.S.A. 47:1A-2 (repealed by L. 2001, c.
 404, § 17, effective July 7, 2002).]

The Right to Know Law further stated, in relevant part, that

records were exempt from disclosure if:

 provided in this act or by any other statute,
 resolution . . . of the Legislature, executive
 order of the Governor, rule of court, any
 Federal Law, regulation or order, or by any
 regulation promulgated under the authority of
 any statute or executive order of the
 Governor[.]9

 [Ibid.]

 Subsequently, the 1967 version of the NJPRA allowed for the

public inspection of pupil records, subject to State Board

regulations:

 Public inspection of pupil records may be
 permitted and any other information relating
 to the pupils or former pupils of any school
 district may be furnished in accordance with
 rules prescribed by the state board, and no

9
 The substance of this Right to Know Law provision was retained
in OPRA. See N.J.S.A. 47:1A-9.

 21
 A-3972-14T4
 liability shall attach to any member, officer
 or employee of any board of education
 permitting or furnishing the same accordingly.

 [L. 1967, c. 271, codified at N.J.S.A. 18A:36-
 19 (amended later at L. 1977, c. 346, § 1).]

 The corresponding regulations then in effect allowed four

categories of requestors to inspect pupil records, at the

discretion of local boards of education: (1) authorized

representatives of the Selective Service System, Federal Bureau

of Investigation, United States Army, and United States Navy; (2)

persons who had "a legitimate interest in the records for purposes

of systematic educational research, guidance, and social service";

(3) parents, guardians, and adult students; and (4) employers and

higher education institutions. See N.J.A.C. 6:3-1.3(a) to -1.3(d)

(1969). Additionally, the 1969-vintage regulations gave local

boards and their employees the discretion "to withhold items . .

. of a confidential nature or in which the applicant for such

information has no legitimate interest." N.J.A.C. 6:3-1.3(e)

(1969).

 About ten years later, the NJPRA was amended by the

Legislature to its current form, in "response to the problem of

the maintenance and confidentiality of pupil records." Senate

Educ. Comm., Statement to S. 260 (Mar. 29, 1976). The new

language, which replaced the prior statute virtually in its

 22
 A-3972-14T4
entirety, requires local boards of education to protect the

"reasonable privacy" interests of both students and parents:

 The State Board of Education shall provide by
 regulation for the creation, maintenance and
 retention of pupil records and for the
 security thereof and access thereto, to
 provide general protection for the right of
 the pupil to be supplied with necessary
 information about herself or himself, the
 right of the parent or guardian and the adult
 pupil to be supplied with full information
 about the pupil, except as may be inconsistent
 with reasonable protection of the persons
 involved, the right of both pupil and parent
 or guardian to reasonable privacy as against
 other persons and the opportunity for the
 public schools to have the data necessary to
 provide a thorough and efficient educational
 system for all pupils.

 [L. 1967, c. 271, codified at N.J.S.A. 18A:36-
 19 (emphasis added).]

 The 1975 definition of "pupil record" adopted in the

corresponding regulations closely resembled the current definition

of "student record," now found at N.J.A.C. 6A:32-2.1. The 1975

version read:

 information related to an individual pupil
 gathered within or without the school system
 and maintained within the school system,
 regardless of the physical form in which it
 is maintained. This information includes that
 which is manually recorded, electronically
 recorded, mechanically recorded or filmed.

 [N.J.A.C. 6:3-2.2 (1975); 6 N.J.R. 465 (Dec.
 5, 1974) (proposed); 7 N.J.R. 251 (June 5,
 1975) (adopted).]

 23
 A-3972-14T4
 As part of the Senate's consideration of amendments to the

NJPRA, its Education Committee referred to "general agreement that

the current statutes, rules and regulations should be revised to

afford greater protection to both parents and students." Senate

Educ. Comm., Statement to S. 260 (Mar. 29, 1976) (emphasis added).

The Committee explicitly noted in that regard that it had

"carefully considered" two timely developments regarding pupil

records, including the enactment of FERPA in 1974, and significant

revisions to the New Jersey Administrative Code at N.J.A.C. 6:3-

2.1 to -2.8. Ibid.

 FERPA

 FERPA "prohibit[s] the federal funding of educational

institutions that have a policy or practice of releasing education

records to unauthorized persons." Gonzaga Univ. v. Doe, 536 U.S.

273, 276, 122 S. Ct. 2268, 2271, 153 L. Ed. 2d 309, 316 (2002).

No funding is provided to educational agencies that "release . .

. education[al] records (or personally identifiable information

contained therein . . .) of students without the written consent

of their parents" subject to certain exceptions. 20 U.S.C.A. §

1232g(b)(1) (2017); see 34 C.F.R. § 99.30 (2017).

 "Education records" under FERPA are considered to be:

 "records, files, documents, and other
 materials" containing information directly
 related to a student, which "are maintained
 by an educational agency or institution or by

 24
 A-3972-14T4
 a person acting for such agency or
 institution."

 [Owasso Indep. Sch. Dist. No. I-011 v. Falvo,
 534 U.S. 426, 429, 122 S. Ct. 934, 937, 151
 L. Ed. 2d 896, 902 (2002) (quoting 20 U.S.C.A.
 § 1232g(a)(4)(A)).]

 The critical concept of "personally identifiable information"

(commonly referred to as "PII") under FERPA includes, but is not

limited to:

 (a) The student's name; (b) The name of the
 student's parent or other family members; (c)
 The address of the student or student's
 family; (d) A personal identifier, such as the
 student's social security number, student
 number, or biometric record; (e) Other
 indirect identifiers, such as the student's
 date of birth, place of birth, and mother's
 maiden name; (f) Other information that, alone
 or in combination, is linked or linkable to a
 specific student that would allow a reasonable
 person in the school community, who does not
 have personal knowledge of the relevant
 circumstances, to identify the student with
 reasonable certainty; or (g) Information
 requested by a person who the educational
 agency or institution reasonably believes
 knows the identity of the student to whom the
 education record relates.

 [34 C.F.R. § 99.3 (2017).]

 Parental consent is not required under FERPA when records are

shared with authorized persons, including school officials, select

state and local officials, accrediting organizations, and others,

for a legitimate purpose. 20 U.S.C.A. § 1232g(b)(1)(A) through

(L) (2017).

 25
 A-3972-14T4
 Additionally, within the federal regulations enacted pursuant

to FERPA, 34 C.F.R. § 99.31(b)(1) contains an important exception

to the parental consent requirement for "de-identified" or

redacted education records:

 An educational agency or institution, or a
 party that has received education records or
 information from education records under this
 part, may release the records or information
 without the consent required by § 99.30 after
 the removal of all personally identifiable
 information provided that the educational
 agency or institution or other party has made
 a reasonable determination that a student's
 identity is not personally identifiable,
 whether through single or multiple releases,
 and taking into account other reasonably
 available information.

 [34 C.F.R. § 99.31(b)(1).]

 The 1977 Revision of the NJPRA In Light of FERPA and Then-

Existing State Regulations

 When enacting the NJPRA amendments in light of FERPA, the

Senate Committee noted that third-party access to "official

records directly related to the student" under FERPA was "strictly

limited and require[d] written consent of the parents, or in the

event of subpena [sic] or transfer of records to another school,

advance notification of release to the parents or adult pupil."

Senate Educ. Comm., Statement to S. 260 (Mar. 29, 1976).

 The Senate Committee also found instructive the then-current

version of state regulations. The Committee noted that the

 26
 A-3972-14T4
regulations "provide[d] for . . . confidentiality of pupil

records." Ibid. The regulations that existed at the time stated

that "[o]nly authorized organizations, agencies, or persons shall

have access to pupil records." N.J.A.C. 6:3-2.6 (1975). The

prior list of designated parties who had been allowed access at

N.J.A.C. 6:3-1.3 had been expanded by that point to include, in

relevant part: (1) organizations, agencies and persons from

outside the school with written consent from parents, guardians,

or adult pupils, or upon presentation of a court order; (2) bona

fide researchers, with assurances that the records "will be used

under strict conditions of anonymity and confidentiality"; and (3)

other school officials in the event of a student transfer outside

the district. N.J.A.C. 6:3-2.6(a) (1975). The Committee's

Statement did not address, however, the relationship, if any,

between the NJPRA and the Right to Know Law.

 On the topic of notice, the revised regulations that were in

effect in 1977 required local school boards to give parents notice

before disclosing pupil records pursuant to a court order, or to

other school officials if a student was transferring outside of

the district. N.J.A.C. 6:3-2.7(a)(4) (1975). Once the parent

was placed on such notice, N.J.A.C. 6:3-2.8 permitted him or her

to request an immediate stay of the release of records, and to

appeal the proposed disclosure to the Commissioner of Education.

 27
 A-3972-14T4
The regulations did not require such notice, however, before the

disclosure of pupil records to a bona fide researcher.

 In 2005, Title 6, Chapter 3 of the governing regulations was

repealed and replaced by Title 6A, Chapter 32. See 37 N.J.R. 1982

(June 6, 2005) (proposed), 37 N.J.R. 3322 (Sept. 6, 2005)

(adopted). As discussed below, at that time, the State Department

of Education also added N.J.A.C. 6A:32-7.5(g), a provision which

requires districts to "adhere to" OPRA and FERPA. In addition,

the Title 6 authorization provisions discussed above were

incorporated and expanded at N.J.A.C. 6A:32-7.5. Among other

things, the notice and appeal rights provisions in former Title 6

were incorporated at N.J.A.C. 6A:32-7.6 and -7.7.

 A decade later, Title 6A, Chapter 32 was readopted by the

Department of Education in 2015, without significant amendment to

the pertinent regulations. See 46 N.J.R. 1775 (Aug. 18, 2014)

(proposed); 47 N.J.R. 464 (Feb. 17, 2015) (adopted).

 The Current Regulations under the NJPRA

 Several key facets of the current State regulations

critically bear upon the legal issues before us. To begin with,

the regulations broadly define the term "student record" as

 information related to an individual student
 gathered within or outside the school district
 and maintained within the school district,
 regardless of the physical form in which it
 is maintained. Essential in this definition
 is the idea that any information that is

 28
 A-3972-14T4
 maintained for the purpose of second-party
 review is considered a student record.
 Therefore, information recorded by certified
 school personnel solely as a memory aid and
 not for the use of a second party is excluded
 from this definition.

 [N.J.A.C. 6A:32-2.1.]

 The regulations further proclaim that school districts must

"regulate access, disclosure, or communication of information

contained in educational records in a manner that assures [their]

security." N.J.A.C. 6A:32-7.1(b). Chief school administrators,

or their designees, are "responsible for the security of student

records maintained in the school district" and must "devise

procedures for assuring that access to such records is limited to

authorized persons." N.J.A.C. 6A:32-7.4(a).

 In addition, N.J.A.C. 6A:32-7.5(a) prescribes that "[o]nly

authorized organizations, agencies or persons as defined in this

section shall have access to student records[.]" In that regard,

subsection 7.5(e) of the regulations lists sixteen categories of

authorized organizations, agencies, and persons, including

parents, students, certified educational personnel, clerical

personnel, boards of education, accrediting organizations, state

and federal educational officials, child welfare caseworkers, and

bona fide researchers. N.J.A.C. 6A:32-7.5(e).

 Organizations, agencies, or persons who are not otherwise

specified in the regulations can only obtain access to student

 29
 A-3972-14T4
records upon written parental consent or "the presentation of a

court order." N.J.A.C. 6A:32-7.5(e). As we discuss in more depth

below, the regulations are silent with respect to the processes

and standards by which such court orders are to be requested and

adjudicated.

 Also significantly, N.J.A.C. 6A:32-7.5(g) provides:

 In complying with this section, individuals
 shall adhere to requirements pursuant to
 N.J.S.A. 47:1A-1 et seq., the Open Public
 Records Act (OPRA) and 20 U.S.C. § 1232g; 34
 CFR Part 99, the Family Educational Rights and
 Privacy Act (FERPA).

This cross-reference leads us to now address pertinent facets of

OPRA, the main statute relied upon by plaintiffs in their quest

for access.

 OPRA

 OPRA is sweeping legislation intended "to maximize public

knowledge about public affairs in order to ensure an informed

citizenry and to minimize the evils inherent in a secluded

process." Mason v. City of Hoboken, 196 N.J. 51, 64 (2008)

(quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374

N.J. Super. 312, 329 (Law Div. 2004)). "With broad public access

to information about how state and local governments operate,

citizens . . . can play a watchful role in curbing wasteful

government spending and guarding against corruption and

misconduct." Burnett v. Cty. of Bergen, 198 N.J. 408, 414 (2009).

 30
 A-3972-14T4
 To that end, N.J.S.A. 47:1A-1 provides that "government

records shall be readily accessible . . . by the citizens of this

State, with certain exceptions, for the protection of the public

interest[.]" Moreover, "any limitations on the right of access .

. . shall be construed in favor of the public's right of access[.]"

N.J.S.A. 47:1A-1.

 "Government records" are broadly defined under OPRA to

include any document "made, maintained or kept on file in the

course of . . . official business by any officer, commission,

agency or authority of the State or of any political subdivision

thereof[.]" N.J.S.A. 47:1A-1.1. However, N.J.S.A. 47:1A-1.1

expressly "excludes twenty-one categories of information" from its

expansive definition of a government record; "[t]he public's right

of access [is] not absolute." Educ. Law Ctr. v. State Dep't of

Educ., 198 N.J. 274, 284 (2009).

 Examples of information exempted by OPRA from disclosure

under N.J.S.A. 47:1A-1.1 include such items as legislative

memoranda, records subject to the attorney-client privilege, crime

victim records, trade secrets, security/surveillance information,

and Social Security numbers. N.J.S.A. 47:1A-1 also contains an

exemption limited to "public institution[s] of higher education"

only, which protects "information concerning student records or

grievance or disciplinary proceedings against a student to the

 31
 A-3972-14T4
extent disclosure would reveal the identity of the student."

N.J.S.A. 47:1A-1.1 (emphasis added). No such comparable exemption

exists within OPRA for public elementary or secondary educational

institutions.

 Notably for the present cases, N.J.S.A. 47:1A-9(a) provides

that OPRA "shall not abrogate any exemption of a public record or

government record from public access" contained in other federal

or state statutes or regulations. See O'Boyle v. Borough of

Longport, 218 N.J. 168, 185 (2014) (recognizing that "[a]

government record may be excluded from disclosure by other

statutory provisions").

 OPRA also contains a privacy clause requiring public agencies

"to safeguard from public access a citizen's personal information

with which it has been entrusted when disclosure thereof would

violate the citizen's reasonable expectation of privacy[.]"

N.J.S.A. 47:1A-1; Asbury Park Press v. Cty. of Monmouth, 201 N.J.

5, 7 (2010); Burnett, supra, 198 N.J. at 414. In applying the

privacy clause, our courts consider the following factors to assess

whether the government records at issue must be withheld or require

redaction, in the interest of privacy, prior to disclosure under

OPRA:

 "(1) the type of record requested; (2) the
 information it does or might contain; (3) the
 potential for harm in any subsequent
 nonconsensual disclosure; (4) the injury from

 32
 A-3972-14T4
 disclosure to the relationship in which the
 record was generated; (5) the adequacy of
 safeguards to prevent unauthorized
 disclosure; (6) the degree of need for access;
 and (7) whether there is an express statutory
 mandate, articulated public policy, or other
 recognized public interest militating toward
 access."

 [Burnett, supra, 198 N.J. at 427 (quoting Doe
 v. Poritz, 142 N.J. 1, 88 (1995)).]

 III.

 A.

 Our fundamental analytic task is to attempt to construe and

harmonize these various provisions under the NJPRA, FERPA, OPRA,

and the associated regulations, particularly the detailed set of

student record access provisions set forth at N.J.A.C. 6A:32-7.1

to -7.8.

 In undertaking this difficult task, we are guided by well-

established principles of statutory and regulatory interpretation.

Ultimately, "[a] court's responsibility 'is to give effect to the

intent of the Legislature.'" State v. Harper, 229 N.J. 228, 237

(2017) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). "To

do so, we start with the plain language of the statute. If it

clearly reveals the Legislature's intent, the inquiry is over."

Ibid. (citing DiProspero v. Penn, 183 N.J. 477, 492 (2005)). On

the other hand, "[i]f a law is ambiguous, we may consider extrinsic

sources including legislative history." Ibid. (citing Parsons ex

 33
 A-3972-14T4
rel. Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 308

(2016)). "We also look to extrinsic aids if a literal reading of

the law would lead to absurd results." Ibid. (citing Burnett,

supra, 198 N.J. at 425).

 As is the case here, where a court is reviewing multiple, but

related, statutory provisions, "the goal is to harmonize the

statutes in light of their purposes." American Fire & Cas. Co.

v. N.J. Div. of Taxation, 189 N.J. 65, 79-80 (2006) (citations

omitted); see also Town of Kearny v. Brandt, 214 N.J. 76, 98

(2013). Reviewing courts "presume that the Legislature was aware

of its own enactments and did not intend to create intentional

conflict between . . . statutory schemes without expressly

overriding provisions." Headen v. Jersey City Bd. of Educ., 212

N.J. 437, 449 (2012). Also, "[w]e must presume that every word

in a statute has meaning and is not mere surplusage, and therefore

we must give those words effect and not render them a nullity."

In re Attorney General's "Directive on Exit Polling: Media & Non-

Partisan Pub. Interest Grps.", 200 N.J. 283, 297-98 (2009)

(citations omitted).

 These same principles apply when we interpret the meaning of

duly-adopted administrative regulations. Generally, a "strong

presumption of reasonableness must be accorded [to an] agency's

exercise of its statutorily delegated duties." In re Certificate

 34
 A-3972-14T4
of Need Granted to the Harborage, 300 N.J. Super. 363, 380 (App.

Div. 1997) (citations omitted). "We interpret a regulation in the

same manner that we would interpret a statute." U.S. Bank, N.A.

v. Hough, 210 N.J. 187, 199 (2012). The "paramount goal" is to

determine the regulation drafter's intent. Ibid. Ordinarily,

that intent "is found in the actual language of the enactment."

Ibid. Courts are not to "rearrange the wording of the regulation,

if it is otherwise unambiguous, or engage in conjecture that will

subvert its plain meaning." Ibid. (citations omitted). Even so,

if a regulation's literal wording yields "more than one plausible

interpretation," "a reviewing court may consider extrinsic

sources[.]" In re Eastwick Coll. LPN-to-RN Bridge Program, 225

N.J. 533, 542 (2016).

 As an appellate court, we review the trial courts' decisions

on statutory and regulatory legal issues de novo. See, e.g.,

Harper, supra, 229 N.J. at 237 (with reference to the meaning of

a statute); U.S. Bank, supra, 210 N.J. at 198-99 (with reference

to the meaning of a regulation). See also K.L. v. Evesham Twp.

Bd. of Educ., 423 N.J. Super. 337, 349 (App. Div. 2011) (applying

de novo review in the specific context of legal issues concerning

student records access), certif. denied, 210 N.J. 108 (2012). "A

trial court's interpretation of the law and the legal consequences

that flow from established facts are not entitled to any special

 35
 A-3972-14T4
deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,

140 N.J. 366, 378 (1995) (citations omitted). Indeed, according

total deference to the trial court would be impossible in the

context of these four consolidated appeals, which involve

conflicting and disparate interpretations of the law made by

different judges in different counties.

 B.

 As a starting point to our de novo legal analysis, we note

it is clear and essentially undisputed that the school records

sought here are within the scope of OPRA's broad definition of

"government record[s.]" N.J.S.A. 47:1A-1.1. They are not "higher

education" records exempted from OPRA under N.J.S.A. 47:1A-1.1.

Moreover, it is not disputed that the documents sought by

plaintiffs comprise "education records" under FERPA because they

contain "information directly related to a student" and are

maintained by the school districts. 20 U.S.C.A. § 1232g(a)(4)(A).

 A more difficult related question is whether the documents

sought, if they are redacted to remove personally identifiable

information, still comprise "student records" governed by the

disclosure restrictions prescribed by the regulations in the New

Jersey Administrative Code. Absent their redaction, the

settlement agreements, access logs, and other documents being

sought by plaintiffs indisputably are "student record[s]" within

 36
 A-3972-14T4
the definition set forth in N.J.A.C. 6A:32-2.1, because they

contain "information related to an individual student gathered

within or outside the school district, . . . regardless of the

physical form in which it is maintained." Ibid. (emphasis added).

The provision stresses that "[e]ssential in this definition is the

idea that any information that is maintained for the purpose of

second-party review is considered a student record." Ibid.

(emphasis added). Hence, the regulation's definition is broad and

clearly aimed at promoting the substantial public policy to protect

student privacy, as articulated within the enabling statute. See

N.J.S.A. 18A:36-19.

 The trial judge in the Cherry Hill case reasoned that

documents held by school districts are no longer "student records"

once personally identifiable information is removed from those

documents through redaction. We respectfully disagree.

 The adjective "related," as used within the definition of a

student record in N.J.A.C. 6A:32-2.1 is a sweeping concept. The

primary dictionary definition published for the term "related" in

Webster's Dictionary is "connected" or "associated." See

Webster's II New College Dictionary 934 (1999 ed.). Other

definitions of the term "related" include "allied by nature [or]

origin," and "having [a] relationship to or with something else[.]"

The Random House College Dictionary 1113 (Revised ed. 1982),

 37
 A-3972-14T4
Black's Law Dictionary 1479 (10th ed. 2014). Similar broad

concepts are conveyed by the term "relevance" in our Rules of

Evidence, which treat "relevant" evidence as proof that has "any"

tendency to prove or disprove a fact of consequence. See N.J.R.E.

401.

 We decline to read the term "related" in the Department of

Education's definition of a "student record" artificially or

narrowly, especially given the regulation's express statement that

a record's actual "physical form" does not matter. N.J.A.C. 6A:32-

2.1.

 For example, a document reflecting a school district's

settlement of claims for special services by a hypothetical

disabled student, Mary Jones, remains a "student record," even if

her name and other personal identifiers are removed from the

settlement agreement. The record still "relates" to Mary Jones

and discusses aspects of her life. The document does not cease

becoming a "student record," or change its fundamental character,

even if, say, a redacting employee took an extra-wide marker to

mask the child's name, address, Social Security number, and other

demographic information, or replaced the actual names within it

with fictitious names. Jane Eyre surely was Charlotte Bronte's

novel even though it bore the pen name of "Currier Bell"; likewise

 38
 A-3972-14T4
the works of Samuel Clemens were no less his own despite being

issued under the pseudonym of "Mark Twain."

 Given this premise, we then must consider the specific

limitations on access to student records expressed within N.J.A.C.

6A:32-7.1 through -7.8. We are mindful that those regulations,

at least as they existed in 1975, were accorded the positive

imprimatur of the Legislature, as explicitly stated in the Senate

Committee's 1976 Report. Senate Educ. Comm., Statement to S. 260

(Mar. 29, 1976). Moreover, as a matter of law, those duly-enacted

regulations are entitled to a presumption of validity, even if

they did not have the Senate's endorsement. See, e.g., N.J. State

League of Muns. v. Dep't of Cmty. Affairs, 158 N.J. 211, 222 (1999)

(noting the presumption of validity afforded to regulations); In

re Twp. of Warren, 132 N.J. 1, 26 (1993).

 We do not read the language in N.J.A.C. 6A:32-7.5(g), which

cross-references OPRA and FERPA, to signify that those other two

statutes allow courts to disregard the access limitations within

our State's regulations concerning student records. Subsection

7.5(g) of N.J.A.C. 6A:32 merely states that, "[i]n complying with

[the Section 7.5 access provisions], individuals shall adhere to

requirements pursuant to . . . [OPRA and FERPA.]" Id. Yet, no

provisions within OPRA or FERPA explicitly "require" school

 39
 A-3972-14T4
districts to turn over records that are protected under state law.

Consequently, we must strive to harmonize those enactments.

 The language within the NJPRA adopted by the Legislature in

1977 assures pupils, parents, and guardians the statutory right

of "reasonable privacy as against other persons[.]" N.J.S.A.

18A:36-19. The regulatory history reflects the deliberate

adoption of specific provisions restricting student records access

to a limited group of authorized persons or organizations. On the

whole, these provisions limiting access to only parties on the

authorized list serve to protect the privacy of students and

parents from intrusion by random third parties, except where there

is written parental consent or a court order requiring such

disclosure. These limitations on public access have remained a

key feature of the regulations, even in the wake of OPRA's

enactment and the replacement of Title 6, Chapter 3 of the

Administrative Code with Title 6A, Chapter 32.

 The first historical mention of OPRA or FERPA in the NJPRA's

regulations occurred in 2005, when the Department of Education

added N.J.A.C. 6A:32-7.5(g), requiring districts to "adhere to"

OPRA and FERPA. Notably, N.J.A.C. 6A:32-7.5(g)'s plain language

does not expressly incorporate FERPA's provisions for the

redaction of PII into the NJPRA or its regulations. Moreover,

nothing in the NJPRA or its regulations states that sufficiently

 40
 A-3972-14T4
anonymized documents, with all PII removed, are no longer "student

records" under N.J.A.C. 6A:32-2.1.

 Although the federal regulations, specifically 34 C.F.R. §

99.31(b), permit disclosure of redacted education records to third

parties without parental consent when all PII is removed, FERPA

does not mandate such disclosures. Nor does FERPA preclude

individual states from adopting stricter privacy protections. See

20 U.S.C.A. § 1232g; 34 C.F.R. § 99.31(b), (d). See also James

Rapp, Education Law § 13.04[5] (Matthew Bender & Co. 2017) ("States

may impose additional or, perhaps, more restrictive requirements,

but they cannot preempt FERPA.").

 Here in New Jersey, the 1977 amendments to the NJPRA reflected

the Legislature's heightened concern, post-FERPA, to safeguard the

reasonable privacy interests of parents and students against the

opposing interests of third parties who may seek access to their

student records. The limitations appearing in the NJPRA's

regulations were in place in their initial form even before OPRA

was enacted. The overall regulatory history shows that the

Department of Education has consistently administered the NJPRA

to allow public access to student records to only a finite group

of individuals and organizations, absent parental consent or a

court order, in the interest of maintaining the privacy and

confidentiality of those records.

 41
 A-3972-14T4
 The language within N.J.A.C. 6A:32-7.5(g) added in 2005 does

not undermine that analysis. It is reasonable to conclude that

N.J.A.C. 6A:32-7.5(g) centrally concerns functionality – a

district's processing of student record requests from an

authorized person or organization. See K.L., supra, 423 N.J.

Super. at 350 ("In providing access to school records in accordance

with N.J.A.C. 6A:32-7.5, school districts must also comply with

the requirements of OPRA and FERPA, N.J.A.C. 6A:32-7.5(g)."). For

instance, if a school district receives an OPRA request from an

authorized person or organization listed under N.J.A.C. 6A:32-

7.5(e), then it must process that request in compliance with OPRA

and FERPA requirements. Nothing in the plain language of N.J.A.C.

6A:32-7.5(g), however, supersedes or nullifies the limitations of

"authorized" parties, as set forth at N.J.A.C. 6A:32-7.5(a) and

(e). Hence, we agree with the judge in the Hillsborough case that

a requestor cannot gain access to a student record unless the

requestor satisfies one of the "[a]uthorized" categories listed

in N.J.A.C. 6A:32-7.5(e)(1) through (16).

 C.

 The next analytical query we face is whether Innisfree and

L.R. may nonetheless be able to obtain the requested records by

relying on other portions of the State regulations. Two

possibilities exist in that regard.

 42
 A-3972-14T4
 1.

 First, it is at least conceivable that Innisfree might be

appropriately categorized under N.J.A.C. 6A:32-7.5(e)(16) as a

"[b]ona fide researcher" capable of justifying "the nature of

[its] research project and the relevance of the records sought."

Ibid. Such access to student records for research purposes must

be predicated on "strict conditions of anonymity and

confidentiality." Ibid.

 Although the record in the four cases before us is sparse on

this subject and was not specifically adjudicated, at least one

dimension of Innisfree's activities as a non-profit organization

appears to involve gathering information about the services

provided to disabled students in various school districts. That

information, in turn, presumably will assist Innisfree in

conducting a comparative analysis of the level of services provided

to comparably-situated disabled students, both within a school

district and between districts. Such information could yield

trends or practices that could inform policy-making, academic

studies, grants, and other related endeavors. Although we

recognize that one of Innisfree's activities is participating in

or supporting litigation to vindicate the rights of disabled

students, we do not believe that facet per se eliminates its

arguable status as a bona fide research organization. Nor would

 43
 A-3972-14T4
it for the many other public interest groups and organizations

that both participate in litigation and disseminate public policy-

related research.

 We discern offhand no sensible reason for the regulatory

scheme in N.J.A.C. 6A:32-7.5(e)(16) to permit access to records

by, say, university Ph.D. candidates, but not researchers employed

at think tanks and public interest advocacy organizations. The

potential incursion on individual student privacy interests in

either context would be the same, regardless of the identity of

the researcher requesting the records. That said, the trial court

record supplied in these appeals is inadequate to resolve this

issue concerning Innisfree's status conclusively.10 The subject

instead should be litigated on remand, with evidentiary hearings

if necessary. The court's status determination presumably would

provide general guidance for other pending records disputes

involving Innisfree.

10
 Offhand, it is not readily apparent that L.R., as a parent of a
disabled student, is likely to hold the status of a "[b]ona fide
researcher." Even so, we do not foreclose L.R. from attempting
to make such a showing on remand. On a related point, we reverse
the trial court's erroneous decision in the Parsippany-Troy Hills
case to substitute Attorney Epstein for L.R. as the plaintiff.
L.R., as the parent of J.R., is clearly the "real party in
interest" seeking the records on her child's behalf. L.R.'s
attorney was simply acting as her representative when making the
records requests.

 44
 A-3972-14T4
 2.

 A second potential pathway for plaintiffs to gain access to

appropriately-redacted versions of the records may be under

N.J.A.C. 6A:32-7.5(e)(15), which confers such access rights upon

non-qualifying organizations and persons "upon the presentation

of a court order[.]" Unfortunately, N.J.S.A. 6A:32-7.5(e)(15)

does not specify what standards or procedures are to govern

requests to obtain such court orders. Presumably, the process

would be guided by the balancing of competing interests that courts

typically employ in resolving common-law access requests.

More specifically, if the records sought qualify as common-law

public records, then a court must conduct a two-step analysis to

determine whether a requestor is entitled to access. Educ. Law

Ctr., supra, 198 N.J. at 302 (citations omitted). First, the

court must determine whether the requestor has established "an

interest in the public record." Ibid. That interest may be "a

wholesome public interest or a legitimate private interest." Ibid.

Second, the court must determine whether the requestor has

demonstrated that its interest in the public records sought

"outweigh[s] the State's interest in non-disclosure." Id. at 303

(citations omitted).

 With respect to the first prong of the common-law test, a

court may consider legitimate concerns, such as the expenditure

 45
 A-3972-14T4
of public funds, or citizen concerns about how public institutions

carry out decisions. See, e.g., Home News v. State, Dep't of

Health, 144 N.J. 446, 454 (1996) (observing that "a citizen's

concern about a public problem is a sufficient interest").

 In analyzing the second step, courts typically apply and

weigh the factors identified by the Supreme Court in Loigman v.

Kimmelman, 102 N.J. 98, 113 (1986). See also Educ. Law Ctr.,

supra, 198 N.J. at 303. Those factors are:

 (1) the extent to which disclosure will impede
 agency functions by discouraging citizens from
 providing information to the government; (2)
 the effect disclosure may have upon persons
 who have given such information, and whether
 they did so in reliance that their identities
 would not be disclosed; (3) the extent to
 which agency self-evaluation, program
 improvement, or other decisionmaking will be
 chilled by disclosure; (4) the degree to which
 the information sought includes factual data
 as opposed to evaluative reports of
 policymakers; (5) whether any findings of
 public misconduct have been insufficiently
 corrected by remedial measures instituted by
 the investigative agency; and (6) whether any
 agency disciplinary or investigatory
 proceedings have arisen that may circumscribe
 the individual's asserted need for the
 materials.

 [Loigman, supra, 102 N.J. at 113 (citations
 omitted).]

 "Generally, the public's interest in nondisclosure is based

on the need to keep the information confidential." Keddie v.

Rutgers, 148 N.J. 36, 51 (1997). To that end, courts may perform

 46
 A-3972-14T4
an in camera inspection of the requested records as they balance

the relevant factors. Id. at 53-54. See also K.L., supra, 423

N.J. Super. at 359-60 (holding that "whether the requestor should

be granted access to the records [under common law] requires a

case-by-case, and in fact, document-by-document balancing of the

requestor's interest against the public agency's interest in

confidentiality") (citations omitted). While conducting such an

in camera inspection, courts are authorized to require the

redaction of the records to maintain confidentiality. S. Jersey

Publ'g Co. v. N.J. Expressway Auth., 124 N.J. 478, 499 (1991).

 In this context of the weighing of competing interests,

"administrative regulations bestowing confidentiality upon an

otherwise public document, although not dispositive of whether

there is a common law right to inspect a public record, should,

nevertheless, weigh 'very heavily' in the balancing process, as a

determination by the Executive Branch of the importance of

confidentiality." Bergen Cty. Improvement Auth. v. N. Jersey

Media Grp., Inc., 370 N.J. Super. 504, 521 (2004) (quoting Home

News, supra, 144 N.J. at 455) (citations omitted). In this regard,

the Legislature's declaration of public policy within the NJPRA

at N.J.S.A. 18A:36-19 to safeguard the "reasonable privacy" of

students, and their parents and guardians, must therefore be given

strong consideration.

 47
 A-3972-14T4
 This leads us to underscore the vital importance of a careful

redaction process, and the functional benefits of allowing

parental input into that process. As Innisfree's counsel frankly

acknowledged at oral argument on appeal, the mere use of a

student's initials in redacting his or her records might not be

enough to protect that student's identity and privacy. Mere

initials would be insufficient protection in a smaller school

district in which there may be few or no other of children having

similar initials or similar disabilities. Indeed, the federal

regulations adopted under FERPA recognize that the use of initials

will be inadequate to mask a student's identity in many instances.

 Under certain circumstances, even the redaction of all

personally identifiable information would not prevent reasonable

persons "in the school community" who lack personal knowledge of

the parties involved from identifying the student "with reasonable

certainty." 34 C.F.R. § 99.3(f) (2017). The federal scheme

anticipates such a scenario at 34 C.F.R. § 99.31(b)(1), by

requiring the redacting party to reasonably determine, once all

PII is removed, "that a student's identity is not personally

identifiable, whether through single or multiple releases, and

taking into account other reasonably available information."

 Instructively, student initials can be considered PII under

FERPA, in situations where:

 48
 A-3972-14T4
 (f) Other information that, alone or in
 combination, is linked or linkable to a
 specific student that would allow a reasonable
 person in the school community, who does not
 have personal knowledge of the relevant
 circumstances, to identify the student with
 reasonable certainty.

 [34 C.F.R. § 99.3 (2017).]

When it amended the definition of PII in 2008, the United States

Department of Education offered the following explanation:

 [R]ecords that identify a student by initials,
 nicknames, or personal characteristics are
 [PII] if, alone or combined with other
 information, the initials are linked or
 linkable to a specific student and would allow
 a reasonable person in the school community
 who does not have personal knowledge about the
 situation to identify the student with
 reasonable certainty. For example, if
 teachers and other individuals in the school
 community generally would not be able to
 identify a specific student based on the
 student's initials, nickname, or personal
 characteristics contained in the record, then
 the information is not considered personally
 identifiable and may be released without
 consent. Experience has shown, however, that
 initials, nicknames, and personal
 characteristics are often sufficiently unique
 in a school community that a reasonable person
 can identify the student from this kind of
 information even without access to any
 personal knowledge, such as a key that
 specifically links the initials, nickname, or
 personal characteristics to the student.

 . . . .

 [Under] Paragraph (f) . . . the agency or
 institution must make a determination about
 whether information is [PII] not with regard
 to what someone with personal knowledge of the

 49
 A-3972-14T4
 relevant circumstances would know, . . . but
 with regard to what a reasonable person in the
 school or its community would know, i.e.,
 based on local publicity, communications, and
 other ordinary conditions.

 [73 Fed. Reg. 74806, 74831-32 (Dec. 9, 2008)
 (emphasis added).]

 Similar considerations should be applied here in dealing with

access requests for student records under our state's laws and

regulations. The review of such requests should be conducted on

a case-by-case basis, depending on the specific nature of the

request and particular kind(s) of records sought. Because none

of the trial courts in the present appeals addressed these common-

law balancing issues, we do not resolve them here.11 Instead, the

balancing of interests should be adjudicated in the first instance

in the trial court on remand.12

11
 We recognize that L.R.'s verified complaints in the Parsippany-
Troy Hills and Camden City cases invoked OPRA, but do not contain
separate counts under the common law. However, as our opinion has
shown, a common-law balancing of interests is implicated here
under the "court order" pathway for access at N.J.A.C. 6A:32-
7.5(e)(15). In light of our clarification of the governing laws,
L.R. is free to amend her complaints on remand to include common-
law claims.
12
 We discern no immediate necessity on remand for the defendant
school boards to provide a "Vaughn index," and defer that question
to the sound discretion of the trial court as the remand
proceedings develop.

 50
 A-3972-14T4
 D.

 As a key procedural facet of the redaction process, we hold

that school districts must afford parents and guardians a

reasonable opportunity to comment upon the proposed redactions of

records relating to their own child. A parent or guardian may

possess background and contextual information that could show how

his or her child might be readily identified within the community,

despite good faith efforts by school employees to perform effective

and thorough redactions of the child's records. Their voices

should be heard in the process.

 In this regard, the three-day parental notice mandated in

N.J.A.C. 6A:32-7.6(a)(4) for situations where a court order for

disclosure is sought should be scrupulously observed.13 The three-

day period has been codified in the regulations since at least

1974, and clearly remains an important ingredient. See 6 N.J.R.

466 (Dec. 5, 1974) (reflecting the genesis of the notice

requirement in the earlier version of the regulation, N.J.A.C.

6:3-2.7(a)(4)).

 Although the three-day parental notice period is not

mentioned within the other portions of the Title 6A regulations

13
 We acknowledge the sensible exception in N.J.A.C. 6A:32-
7.6(a)(4)(i) exempting notice where the parent is a party to a
court proceeding involving child abuse or dependency matters. See
also 20 U.S.C.A. § 1232g(b)(2)(B).

 51
 A-3972-14T4
where access may be provided to authorized requestors such as bona

fide researchers, we conclude that such notice should be supplied

in all situations. Doing so would carry out the objectives of the

NJPRA to achieve "reasonable privacy" and help avoid the

inadvertent disclosure of a child's identity.

 To be sure, it is not our role in this appellate opinion to

micro-manage the precise manner in which the redaction process is

conducted. In particular, we do not resolve at this time whether

the substantial special services charge quoted by the Parsippany-

Troy Hills district of nearly six figures is reasonable and

justified. Instead, if any right of access is established, an

evidentiary hearing must be conducted on remand in the trial court

to develop the record further on that issue, and to enable that

court14 to make a more informed ruling.

 E.

 The GRC's administrative decision in Popkin, supra, is

partially but not fully consistent with our overall analysis. The

complainant in Popkin filed an OPRA request with a school board,

seeking records that would reveal the dollar amount that the school

district paid in public funds to settle a disabled student's claim

for services. The school board declined to turn over the requested

14
 We recognize that the Morris County judge who approved the
special services charge is now retired.

 52
 A-3972-14T4
documents, deeming them confidential "student records" protected

under the NJPRA and its associated regulations. The school board

also asserted that disclosing a redacted version of the documents

containing only the settlement amount, but not the specifics of

the student's disability and the services the student needed,

could be misconstrued and hamper the board's ability to settle

future cases.

 The GRC agreed with the school board's position in Popkin,

concluding that the requested documents were "student records"

within the definition of N.J.A.C. 6A:32-2.1, because the documents

"related to" an individual student and had been "gathered" and

"maintained" by the district. The GRC also held that the

complainant, who was apparently not the parent or guardian of the

student whose case had settled, was not an "authorized person"

listed in the subsections N.J.A.C. 6A:32-7.5(e)(1) through (16)

entitled to access the records. The GRC further pointed out that

OPRA expressly states that it "shall not abrogate any exception

of a public record or government record from public access . . .

pursuant to . . . [a] regulation promulgated under the authority

of any [other] statute." See N.J.S.A. 47:1A-9(a).

 For the reasons we have already stated, we concur with the

GRC's reasoning in Popkin that copies of a school district's

settlement agreements with disabled students, even if redacted,

 53
 A-3972-14T4
nonetheless comprise "student record[s]" under N.J.A.C. 6A:32-2.1

and protected under the NJPRA. However, the GRC was not asked in

Popkin to consider, as here with respect to Innisfree, whether the

requestor was a bona fide researcher. Nor did the GRC address

whether the "court order" pathway under N.J.A.C. 6A:32-7.5(e)(15)

could make the document available to a requestor who chooses the

procedural option under OPRA of litigating a record request dispute

in the Superior Court rather than before the GRC, an administrative

tribunal. See N.J.S.A. 47:1A-7. Moreover, the GRC is confined

to the terms of the OPRA statute and has no jurisdiction over

common-law claims of a right of access. Ciesla v. N.J. Dep't of

Health & Senior Servs., 429 N.J. Super. 127, 146-48 (App. Div.

2012). Hence, those two discrete legal issues, which we are

remanding to the trial court, were not addressed in Popkin.

 F.

 We need not resolve at this time the outstanding issues of

counsel fees and costs. For one thing, plaintiffs' status as the

ultimate prevailing parties in the Cherry Hill, Hillsborough, and

Parsippany-Troy Hills cases has not been established. Moreover,

additional legal work will no doubt be performed by counsel on

remand. Consequently, it is premature to decide fee-shifting

issues on these appeals.

 54
 A-3972-14T4
 We are satisfied, however, that a student or his or her

parent, guardian, or authorized legal representative is entitled,

subject to the child abuse and dependency caveats in N.J.A.C.

6A:32-7.6(a)(4)(i), to reasonable and prompt access to unredacted

copies of his or her own records and access logs, assuming they

do not incidentally mention or identify other students. In that

regard, we agree with the trial court in Camden City that attorney

Epstein sufficiently exhibited his status as L.R.'s representative

in seeking her child's records. The district's insistence that

Epstein sign its own self-created release form containing a

liability release was excessive and unreasonable.

 We therefore affirm the Camden County judge's decision

relating to J.R.'s own records and access logs, consistent with

the terms of the NJPRA, OPRA, and FERPA. However, the balance of

the issues posed in that case, which concern efforts by L.R. to

obtain letters, memos, correspondence, emails, and other documents

that refer to J.R., but which conceivably could also refer to or

identify other students,15 must be reexamined on remand, in light

15
 For instance, the school district files might contain a memo
that lists the special-needs children, including J.R., who take
the same designated bus to and from school or perhaps to an outside
activity. Or perhaps the district's records may include a
narrative of J.R.'s activities in the classroom on a particular
day and J.R.'s interactions with other named children. The
realistic possibility that personal identifying information about
such other students might be disclosed in the records, absent
meticulous redaction, requires close scrutiny on remand, with

 55
 A-3972-14T4
of the generic guidance we have provided in this opinion on

substantive issues and in interpreting the regulatory framework.

 G.

 As a parting subject, we encourage the New Jersey Department

of Education to consider formulating "best practices" guidance –

perhaps expanding or revising the existing regulations – to address

the myriad issues of implementation that have been presented by

these four cases. We rejected Innisfree's eleventh-hour

contention it raised on the eve of the scheduled appellate oral

argument that the Department was an indispensable party, and that

these appeals should have been re-calendared with a mandate for

the Department's (or Attorney General's) participation.16 Even so,

we presume the Department, which we were advised by Innisfree's

counsel had been supplied with courtesy notice of these appeals

and did not thereafter move to intervene or participate, will be

guided by this precedential opinion accordingly.

appropriate notice given to the parents or guardians of such other
children that may be mentioned in the records. In light of the
time and effort such redaction could entail, L.R. is free on remand
to withdraw or modify her outstanding requests in the Camden City
case.
16
 We note that no pleading or brief in this case has challenged
the Department of Education's records access regulations as ultra
vires or otherwise invalid, an argument that would have required
service of a formal notice upon the Attorney General much earlier
in the litigation. See R. 4:28-4(a)(1); see also R. 2:5-1(h)
(requiring such notice to be served five days after the filing of
the notice of appeal).

 56
 A-3972-14T4
 IV.

 For these various reasons, the order compelling turnover in

Cherry Hill (A-3066-15) is vacated and remanded for further

proceedings, and the order denying turnover in Hillsborough (A-

4214-14) is affirmed in part, but without prejudice to Innisfree

establishing access rights on remand on the alternative grounds

that we have suggested under N.J.A.C. 6A:32-7.5(e)(15) or (16).

The order granting access to L.R. in Parsippany-Troy Hills (A-

4214-14) is also vacated and remanded for further proceedings,

including, if access is approved, an evidentiary hearing on the

projected reasonable costs of redaction.

 The orders in Camden City (A-3972-14) are affirmed in part,

solely as to the release of J.R.'s own records, but that case is

remanded for further proceedings regarding access to records that

mention or could identify other students.

 To achieve consistency, we direct that venue for all four

remanded cases be transferred to the Camden vicinage, where two

of these four cases originated. We realize that doing so may pose

some inconvenience to some of the litigants from the Somerset

County and Morris County cases. Nonetheless, consolidation of all

four "test" cases within the same vicinage before a single judge

will have the advantages of efficiency and uniformity.

 57
 A-3972-14T4
 Lastly, because we readily appreciate that one or more parties

may pursue Supreme Court review of our decision, we stay this

opinion, sua sponte, for thirty days. If a petition for

certification or motion for leave to appeal is filed with the

Supreme Court by any party in any of these four cases before that

thirty-day period lapses, the automatic stay shall remain in force

until such time as the Supreme Court may otherwise direct. We

hope that preserving the status quo in such a manner, pending the

Court's anticipated review, will minimize disruption and avoid the

harmful consequences of any improvident interim disclosures.

 All four appeals are consequently remanded, in accordance

with the terms of this opinion. We do not retain jurisdiction.

 58
 A-3972-14T4